James David AUTRY, Appellant,

v.

The STATE of Texas, Appellee.

No. 68899.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 20, 1982.

Rehearing Denied Feb. 10, 1982.

Charles D. Carver, Michael D. Murphy, Port Arthur, for appellant.

James S. McGrath, Dist. Atty. and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. After finding appellant guilty, the jury answered "yes" to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

In his second ground of error, appellant challenges the sufficiency of the evidence to support his conviction. The court charged the jury on the law of circumstantial evidence. The indictment in the instant cause alleges in pertinent part that on or about April 20, 1980, appellant:

> "did then and there while in the course of committing and attempting to commit robbery upon and of Shirley Drouet intentionally cause the death of Shirley Drouet, hereinafter styled the complainant by shooting her with a gun."

Officer James Hartley, of the Port Arthur Police Department, testified that at 9:00 p. m. on April 20, 1980, he responded to a dispatch concerning a shooting at a convenience store in Port Arthur. Hartley proceeded to the Sak-N-Pak located at Lewis Drive and 9th Avenue. Upon arriving at the scene, the officer found a man lying on the ground in front of the store. Hartley related that this individual was bleeding from the head as an apparent result of a gunshot wound. Upon entering the store, Hartley observed a second individual lying on the floor behind the counter. The second individual, later identified as Joseph Broussard, was dead. Hartley testified that he then observed a woman "in a sitting position" next to a display case in the store. The woman was gagging and bleeding from a gunshot wound to the head. The woman, who had been a clerk in the store, was identified as Shirley Drouet.

Ethel Gobert testified that on the night of April 20, 1980, she was in an automobile near the Sak-N-Pak. Gobert related that she heard three gunshots which came from the direction of the store. She then observed an individual running from the store who was "right across the sidewalk" from her. She related that the area was well lit and that she was able to get a good look at the individual's face for a few seconds. After observing the individual, Gobert and her companion returned to the Sak-N-Pak and observed the three gunshot victims. Gobert identified appellant as the individual she had seen running from the Sak-N-Pak at the time she heard the gunshots. Finally, Gobert stated that at the time she observed appellant running from the store, she did not see a weapon in his hand.

Mark Sandifer testified that at 1:00 p. m. on April 20, 1980, he loaned one of his automobiles to his brother, John Alton Sandifer. Approximately eight hours later, Sandifer saw the automobile he had loaned to his brother in the parking lot of the Sak-N-Pak. Sandifer drove into the parking lot and saw appellant standing outside the store. Appellant told Sandifer that his brother was inside the store. Sandifer's brother then came out of the store and drove away in the automobile which he had borrowed earlier that day. Appellant then entered the automobile which was driven by Mark Sandifer.

Sandifer related that he followed his brother for a short distance and appellant then asked him to stop the car. Appellant then jumped out of the car and pulled a handgun out of his shirt. Sandifer described the handgun as a "chrome-plated stainless steel gun." After appellant left the car, Sandifer saw him running back toward the Sak-N-Pak. Sandifer then continued to follow his brother to a trailer in which his

brother and appellant lived. Sandifer testified that when appellant entered his automobile in the parking lot of the Sak-N-Pak, he did not see a gunshot victim lying in the parking lot.

Later that evening, Sandifer returned to his brother's trailer with his father, John Sandifer. While his father waited outside, Sandifer entered the trailer which was occupied by appellant and his brother. Sandifer testified that appellant pulled two handguns out of his pockets. Sandifer testified that appellant then refused to release the guns because "he told me that because he knew that I knew—he knew that I knew that he killed some people." One of the weapons which appellant pulled out of his pocket was similar in appearance to the weapon which he had produced at the time he left Sandifer's automobile and headed back toward the Sak-N-Pak. Sandifer then obtained the two weapons from appellant and returned them to his father who was waiting outside the trailer. Sandifer, his father and his brother then took the two handguns to the police.

John Sandifer testified that he is the father of John Alton Sandifer and Mark Sandifer. The witness related that he waited outside his son's trailer while his other son, Mark Sandifer, went inside. He stated that both of his sons then came out of the trailer with two handguns. He testified that one of the handguns is a .32 caliber Smith and Wesson pistol which belongs to his wife. He related that the second handgun is a .38 caliber Smith and Wesson which belongs to him. Sandifer did not know that these weapons had been taken from his home.

Officer David Davis, of the Port Arthur Police Department, testified that he conducted an investigation at the scene of the offense. Davis related that the cash register in the store had been turned to the "off" position. The officer found two copper bullet jackets in the store. An inspection of Broussard's wallet revealed that the wallet still contained currency and that the victim's car keys were in his pocket. Likewise, Davis inspected Drouet's purse and found that it contained currency.

Dr. Standley LeBer testified that he performed an autopsy on Drouet's body. LeBer related that he found a single gunshot wound to the center of Drouet's forehead. From the "stippling" on the victim's face, it appeared as though the weapon was three to five feet from her head at the time it was fired. LeBer related that Drouet had died as a result of massive brain destruction from the gunshot wound. During the autopsy, LeBer removed a bullet from Drouet's head. He gave this bullet to the authorities.

Officer Steve Conroy, of the Port Arthur Police Department, testified that he was present when LeBer performed the autopsy upon Drouet. The officer related that LeBer gave him the bullet which was removed from Drouet's head. Conroy then placed this bullet in the evidence locker of the Port Arthur Police Department.

Officer Gary Martin, of the Port Arthur Police Department, testified that he transported several items of evidence connected with the instant offense to the Texas Department of Public Safety Laboratory in Houston. Among the items of evidence turned over to the laboratory were the copper bullet jackets recovered at the store, the two weapons turned over to the authorities by Sandifer and the bullet which had been removed from Drouet's head.

John Beene testified that he is a chemist and firearms examiner for the Texas Department of Public Safety Laboratory in Houston. On April 28, 1980, Beene received various items of evidence from Officer Martin. Beene related that he compared the bullet removed from Drouet's head with the handguns which had been turned over to the authorities by Sandifer. Beene testified that in his opinion, the bullet which had killed Drouet had been fired from the .38 caliber Smith and Wesson handgun which appellant gave to Mark Sandifer.

Officer Martin testified that he and fellow officers arrested appellant at 1:45 a.m. on April 21, 1980. At the time of his arrest, appellant was informed that he was being

arrested for the two murders which had been committed at the Sak-N-Pak.[1]

Officer John Anderson, of the Port Arthur Police Department, testified that at 1:00 p. m. on April 21, 1980, he was in the booking room of the police station. Anderson related that he had not been involved in the investigation of the instant offense. The officer saw appellant enter the booking room and heard him ask to use the telephone in order to call his mother. Anderson testified that he did not intentionally "listen in" on the telephone call, however, in describing the statements he heard appellant make, Anderson testified as follows:

"Q. What did you hear the defendant say?

"A. Whoever he was talking to on the other end he told them that he was in Port Arthur Jail. And that he was charged with two counts of murder.

"Q. What happened then?

"A. Okay. There was kind of a pause. And I assume whoever was on the other end was saying something. "And he said that he had gone into this store and he was going to rob it but it just gone bad.

"Q. What did he say then?

"A. He said that he started shooting but once he started he just couldn't stop.

"Q. Okay. Did he say anything else?

"A. If I remember right towards the end of the conversation he stated that whoever was on the other end should not worry because he was going to get out of it.

Officer Paul Noyola, of the Port Arthur Police Department, testified that he was involved in the investigation of the instant offense. Noyola related that he had found no other "double killings" at a convenience store in Port Arthur on or about April 20, 1980.

Appellant now urges that the circumstantial evidence is insufficient to support his conviction. He maintains that the circumstances proven do not exclude every reasonable hypothesis because "it is entirely reasonable and probably [sic] that John Alton Sandifer shot and killed Shirley Drouet and subsequently ran from the store and made his flight."

■ A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the defendant. *Schershel v. State*, 575 S.W.2d 548, Tex.Cr.App.; *Bryant v. State*, 574 S.W.2d 109, Tex.Cr.App. Therefore, proof which amounts only to a strong suspicion or mere probability is insufficient. *Ford v. State*, 571 S.W.2d 924, Tex.Cr.App. However, every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction. *Earnhart v. State*, 575 S.W.2d 551, Tex.Cr.App. Finally, the rules of circumstantial evidence do not require that circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis intended is a reasonable one consistent with the facts proved and the circumstances, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Swink v. State*, 617 S.W.2d 203, Tex.Cr.App.; *Sullivan v. State*, 564 S.W.2d 698, Tex.Cr.App.

■ The evidence in the instant case reveals that appellant and John Alton Sandifer were present at the scene of the offense. When appellant, John Alton Sandifer and Mark Sandifer left the Sak-N-Pak, there was not a body in the parking lot. While riding in Mark Sandifer's automobile, appellant jumped out of the automobile and ran toward the Sak-N-Pak with a pistol in his hand. Appellant was seen running from the store after a witness heard three gun-

---

1. The gunshot victim found lying in the parking lot did not testify at appellant's trial. The record does not reveal the severity of his bodily injury. Trial was held four months after the offense.

shots. Following the offense, appellant was in possession of the weapon used to kill Drouet. When appellant gave the murder weapon to Mark Sandifer, he stated that he "had just killed some people." Finally, some 16 hours after the offense, appellant stated that he had gone into a store "he was going to rob" and that "he started shooting" when things had "gone bad."

We find the evidence sufficient to exclude every reasonable hypothesis except for that of appellant's guilt in killing Shirley Drouet. Appellant's second ground of error is overruled.

In his first ground of error, appellant challenges the sufficiency of the evidence. He maintains the evidence is insufficient to prove that the victim was killed during the course of a robbery or attempted robbery. He urges that the evidence raises the reasonable hypothesis that appellant could have killed Drouet "out of revenge" or because he became "irritated toward" her "because she would not cash a check for him, or would not let him purchase beer because of his state of intoxication."

Appellant was indicted for capital murder pursuant to the provisions of V.T.C.A., Penal Code, Sec. 19.03(a)(2) which provide that a person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. In *Riles v. State*, 595 S.W.2d 858, Tex.Cr.App., the Court stated as follows with regard to construction of the statutory language contained within Sec. 19.03(a)(2), supra:

"The phrase 'in the course of committing or attempting to commit . . .' as used in Sec. 19.03(a)(2), supra, is not defined in the Penal Code. Section 29.01(1) of the code, however, does define 'In the course of committing theft.' That phrase is given the definition of 'conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.' We similarly construe the phrase of Sec. 19.-03(a)(2) to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the

attempt or commission of the offense, i.e., in this case, of robbery. . . ." Id. at 862.

Appellant urges that the evidence does not show murder in the course of committing robbery because there is no showing that any property was taken from the store. As noted above, Officer Davis testified that an inspection of Broussard's wallet revealed that the wallet still contained currency. Likewise, Drouet's purse contained currency when it was found at the scene of the offense. Lillian Young testified that she is the district manager for Sak-N-Pak. Young went to the scene of the offense and found that the cash register had been turned to the off position. She related that the cash register is usually turned off whenever a clerk is stocking the cooler or goes to the restroom. A comparison of the cash register tape with the currency contained within the cash register, revealed that no money had been taken from the register.

V.T.C.A., Penal Code, Sec. 29.02(a)(1) and (2) proscribes the offense of robbery in the following manner:

"(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property he:

"(1) intentionally, knowingly, or recklessly causes bodily injury to another; or

"(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."

In *Watson v. State*, 605 S.W.2d 877, Tex.Cr.App., it was held that the phrase "in the course of committing theft" within the robbery statute, means conduct which occurs in an attempt to commit, during commission, or in immediate flight after the attempt or commission of theft. See V.T.C.A., Penal Code, Sec. 29.01(1). The actual commission of the offense of theft is not a prerequisite to the commission of the offense of robbery. *Robinson v. State*, 596 S.W.2d 130, Tex.Cr.App.; *Earl v. State*, 514 S.W.2d 273, Tex.Cr.App. The State's failure to prove that any property was taken

from the Sak-N-Pak did not render the evidence insufficient to prove that Drouet was murdered while appellant was in the course of committing and attempting to commit the offense of robbery.

Appellant further urges that the evidence is insufficient to show that the murder occurred while in the course of committing or attempting to commit robbery. He maintains that there is no showing that the admissions he made and which were overheard by Officer Anderson, related to the instant offense.

The admissions which were made by appellant and overheard by Officer Anderson were made some 12 hours after appellant's arrest. At the time of his arrest, appellant was informed that he was being arrested for the murders which had been committed at the Sak-N-Pak. In those admissions, appellant stated that he had gone into a store which "he was going to rob." He further stated that "he started shooting" when it "just gone bad." The State further presented evidence at trial which revealed that there had been no other "double killings" at a convenience store in Port Arthur on or about April 20, 1980. We find that the admissions which appellant made in Anderson's presence were shown to relate to the instant offense.

The evidence in the instant cause reveals that appellant while armed with a handgun entered the Sak-N-Pak with the intent to commit a robbery. Following such entry, Drouet was murdered as a result of a gunshot wound to the head. Shortly after the offense, appellant was shown to have been in possession of the weapon used to kill Drouet.

Appellant's contention that the murder was committed "out of revenge" or because "appellant became irritated" is simply not supported by the record. These matters were not developed at trial and do not present a reasonable hypothesis based upon the record which has been presented to this Court. We find the evidence sufficient to prove that Drouet's murder occurred while appellant was in the course of committing and attempting to commit the offense of robbery. Appellant's first ground of error is overruled.

In his third ground of error, appellant contends the court erred in overruling his objection to Officer Anderson's testimony concerning the admissions he overheard appellant make while speaking on the telephone. Appellant maintains that the admissions were "the fruit of his illegal written statement" and that the admissions would not have been made "but for the illegal acts of law enforcement officers."

Following his arrest, appellant signed a written statement concerning the instant offense. Prior to trial, appellant filed a motion to suppress the statement and the court held a hearing thereon in compliance with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and Art. 38.22, V.A.C.C.P. At the conclusion of that hearing, the court entered findings of fact and conclusions of law and ruled that the written statement would not be admissible at trial due to the fact that officers had failed to honor appellant's request to remain silent.

At the pretrial hearing, Officer Martin testified that he arrested appellant at approximately 1:50 a. m. on April 21, 1980. Appellant was given his warnings at the time of his arrest. Appellant signed a consent to search form and officers conducted a search of his trailer. Martin related that appellant arrived at the police station at approximately 3:00 a. m. and was taken before a magistrate who administered warnings to appellant pursuant to Art. 15.-17, V.A.C.C.P. From 3:00 a. m. until 5:30 a. m., appellant was interrogated by several different police officers. Martin testified that he did not participate in the interrogation which lasted approximately two and one-half hours. At 5:30 a. m., Martin began to interrogate appellant concerning the instant offense. He related that appellant indicated his willingness to discuss the offense and eventually signed a written statement at 6:30 a. m. After appellant signed the statement, the interrogation ceased and he was placed in a cell. Martin related that at no point during his interrogation of ap-

pellant, did appellant invoke his right to remain silent. The officer further stated that he was unaware that appellant had at any time, either in writing or orally, requested that officers cease in the interrogation.

Officer Waylon Hughes, of the Port Arthur Police Department, testified that he assisted in the interrogation of appellant from approximately 3:00 a. m. until 5:30 a. m. Hughes related that at no point did appellant orally ask for the interrogation to cease. Hughes testified that during the two and one-half hour period, he was unable to obtain a written statement from appellant. Appellant indicated his willingness to cooperate with the authorities, however, he insisted that he be allowed to personally write the statement in longhand before it was typed. Appellant went to Hughes' office in order to write the statement. Hughes testified that while appellant was in his office, he left the police station in order to go eat breakfast.

■ The record reveals that it was during Hughes' absence that Martin began his interrogation of appellant. Evidence at the suppression hearing revealed that in appellant's handwritten statement, he had invoked his right to remain silent. Such statement, although not incriminating in nature, concluded with appellant writing "... I have nothing else to say...." Martin testified that he was unaware of such request at the time he interrogated appellant. Hughes related that he did not learn of the request until after Martin had obtained a different written statement from appellant. The court ruled that appellant's written statement would be inadmissible at trial because Martin had failed to honor appellant's written request to remain silent.

Officer Anderson testified that he was in the booking office of the Port Arthur Police Station at 1:00 p. m. on April 21, 1980. He related that he was present in the office in order to transfer a prisoner. Anderson testified that he was not connected with the investigation of the instant offense. The officer saw appellant escorted into the booking office and overheard him ask to use the telephone. While appellant was speaking on the telephone, Anderson overheard a portion of the conversation. The admissions made by appellant while speaking on the telephone were subsequently admitted at trial over appellant's objection. It is therefore appellant's contention that "but for the illegal acts of law enforcement officers" he would not have made the admissions which were overheard by Anderson.

■ The fruit of the poisonous tree doctrine is not applicable when knowledge or possession of the evidence in question is obtained from a source independent of the government's wrongful act. *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The standard for determining whether the source of evidence is sufficiently independent of the illegality so as to avoid its taint was set forth in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963):

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal action of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"
> Id. at 487–88, 83 S.Ct. at 417.

Therefore, in the case of statements made by an accused, *Wong Sun* requires that they be sufficiently an act of free will so as to purge the primary taint. Whether the taint has been purged must be determined on the facts of each case after considering such matters as the temporal proximity of the arrest and the confession, the presence of intervening circumstances and the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

In the present case, six and one-half hours elapsed from the time appellant signed the written statement until he called his mother. In describing that period, appellant testified at the suppression hearing that officers "didn't harass" him any further and that he went to his cell and went to sleep. Anderson testified that he overheard appellant ask to use the telephone in order to place a call to his mother. The admissions which were made by appellant while speaking on the telephone were not the result of interrogation.

Appellant argues that "the cat was out of the bag at the time appellant made his telephone conversation" and that "it got out of the bag through the illegal activities of law enforcement" officers. Under *Wong Sun*, contested evidence need not be excluded simply because there is a but for relationship between it and the primary illegality. *United States v. Kennedy*, 457 F.2d 63 (10th Cir. 1972). In *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), the Supreme Court rejected the defendant's argument that his second confession was the fruit of an earlier coerced confession. There, the court stated:

> "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as a fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." Id. at 540–41, 67 S.Ct. at 1398.

In the instant cause, appellant's telephone call to his mother was shown to be an act of free will. The call was placed after appellant had been allowed to sleep and had not been interrogated for six and one-half hours. The admissions which were made were not the result of interrogation. There was no exploitation of the excluded statement by officers connecting the signing of the statement and the placing of the telephone call. We find no causal relationship between the admission and the written statement excluded by the court. Those admissions were in no way induced or tainted by the written statement which the court found to have been obtained in violation of appellant's right to remain silent. We find no error in the court admitting the admissions which were made by appellant and overheard by Anderson. Appellant's third ground of error is overruled.

The judgment is affirmed.

TEAGUE, J., concurs in result.

CLINTON, Judge, concurring.

I concur in the judgment of the Court, but am not satisfied with its treatment of the third ground of error. It seems to me that the Court has been led into a maze of disjointed principles of Fourth and Fifth Amendment law. There is a straighter way out.

The core of appellant's contention is that statements made by him in his telephone conversation with his mother are fruits of his earlier written statement wrongly taken from him by peace officers. But he relies on the "poisoned tree" doctrine of *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and its followings, e.g., *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) and especially *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The doctrine is founded in the Fourth Amendment,[1] and as the Supreme Court explained in *Wong Sun*:

---

1. The policy behind the exclusionary rule is that evidence acquired contrary to a provision forbidding acquisition in a certain way is "that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all," yet facts illegally obtained are not "sacred and inaccessible" for if knowledge of them is "gained from an independent source" the facts are admissible; still, the knowledge of facts "gained by the Government's own wrong cannot be used by it...," *Silverthorne*, supra, 251 U.S. at 392, 40 S.Ct. at 183.

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of unlawful invasion. It follows from our holding in *Silverman v. United States,* 365 U.S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis v. United States,* 227 F.2d 598 [(1st Cir.) ]. Thus, *verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest* as the officers' action in the present case is no less the *'fruit' of official illegality* than the more common tangible fruits of the unwarranted intrusion." [2]

Though appellant cites Fourth Amendment cases, he makes no claim that his Fourth Amendment rights were violated. Thus, legality of the arrest is not challenged, as in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and *Green v. State,* 615 S.W.2d 700 (Tex.Cr.App. 1980); nor is the resultant detention assailed as illegal, see *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Indeed, he does not assert the only colorable Fourth Amendment violation available under the circumstances: invasion of his right to privacy under the rationale of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Accordingly, there is not presented here any proper claim of "primary illegality" under the Fourth Amendment; so, the Court is not called on to make an analysis of Fourth Amendment law with respect to the claim that appellant does assert.

What appellant contends is that he would not have made the incriminating statements in his conversation with his mother "but for the illegal acts of law enforcement officers" in obtaining his written confession

in violation of his constitutional rights. The officer who finally took his confession had not "scrupulously honored" appellant's request to remain silent, *Faulder v. State,* 611 S.W.2d 630 (Tex.Cr.App.1979). Thus asserted is a claim under the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Court draws from its excerpted portion of *Wong Sun,* supra, the following proposition: "Therefore, in the case of statements made by an accused, *Wong Sun* requires that they be sufficiently an act of free will so as to purge the primary taint." But the very case later cited and quoted by the Court, *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), points out just after the part quoted:

" . . . The *Silverthorne* and *Nardone* cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and *do not control this question.*" *Id.,* at 541, 67 S.Ct. at 1398.[3]

Moreover, the measure of admissibility of a confession or incriminating statement is its voluntariness. *Jackson v. Denno,* 378 U.S. 368, 376–377, 84 S.Ct. 1774, 1780–81, 12 L.Ed.2d 908 (1964); *Townsend v. Sain,* 372 U.S. 293, 307–309, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770 (1963). So, the proposition stated by the Court should read: "In the case of statements made by an accused the Fifth Amendment requires that they be sufficiently an act of free will."

In my judgment, the short answer to appellant's contention is contained in the opinion of the Court, but is obfuscated by a revealed concern to "purge the primary taint" of something that is really not in the case. That answer is that appellant placed the telephone call and made incriminating statements in the conversation with his mother of his own free will.

Whatever "psychological and practical disadvantages of having confessed" earlier lingered on as he talked with his mother,

---

**2.** All emphasis is mine unless otherwise indicated.

**3.** Of course, *Wong Sun* is a progeny of *Silverthorne* and *Nardone* but had not yet been decided when *Bayer* was written.

the conditions under which the confession was made no longer obtained. While in the sense alluded to in *United States v. Bayer,* supra, "a later confession may be looked upon as a fruit of the first,"[4] *id.,* at 540, 67 S.Ct. at 1398, though in custody, appellant was not then being interrogated by officers. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); cf. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). "[A] voluntary oral statement is admissible if it is not the 'result of' or does not 'stem from custodial interrogation'," *May v. State,* 618 S.W.2d 333, 348 (Tex.Cr.App.1981).

It is on Fifth Amendment law, then, that the third ground of error should be overruled.

ROBERTS and McCORMICK, JJ., join.

---

**4.** Thus, I would not be so quick to say, as the opinion of the Court does, "We find no causal relationship between the admissions and the written statement excluded by the court."