Sherman WILKINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–81–00052–CR.

Court of Appeals of Texas, San Antonio.

May 19, 1982.

Rip Collins, Austin, for appellant.

Bill White, Dist. Atty., Gregory S. Long, Asst. Dist. Atty., San Antonio, for appellee.

Before ESQUIVEL, BUTTS and CANTU, JJ.

OPINION

ESQUIVEL, Justice.

This appeal is taken from a conviction for aggravated robbery. After being found guilty by a jury, appellant was found to have been convicted previously of a felony as alleged in the indictment, and punishment was assessed at thirty (30) years' confinement.

Since appellant challenges the sufficiency of the evidence, a detailed account of the facts is necessary. On September 2, 1977, at approximately 5:15 a. m., two black males entered a convenience store in San Antonio. One of them pulled a pistol, pointed it at the clerk, Lori Elley, and demanded that she open the cash register. After she did so, the other robber, who was unarmed, went behind the counter and removed money from the register. Elley described the gunman as being approximately five feet seven inches tall, with his hair braided in pink rollers. The other man was an inch or two taller, very slim, and wore a black baseball cap. After the register was opened, the gunman ordered Elley to go into the back room of the store and lie down on the floor. After getting down on the floor, she heard the sound of glass being broken. She later found that a glass display case in the store had been broken into and some knives and wrist watches had been taken from it. Also taken was a tape deck Elley had been holding as security for a loan she had made to a customer. The tape deck had taped to it a piece of paper with the owner's name on it.

As the robbers were gathering money and merchandise, a customer named Dan Jefferson walked in. He saw the two men, and the gunman walked up with the pistol and told him to "hit the floor." His description of the gunman was the same as Elley's: five feet six or seven inches with curlers in his hair. Jefferson could not describe the other man except to say that he was black.

When the robbers left, Elley came out from the back room, told Jefferson to lock the door, and called the police. Officer

James Self arrived two or three minutes later, spoke with Elley and Jefferson, and broadcast a message on his vehicle radio for other officers in the area to watch for a vehicle of unknown description with two black males in it. He described the men as being in their 20's, one with curlers in his hair and wearing a dark plaid shirt, and the other as wearing a yellow plaid shirt and a "brim ball cap."

Officer Marvin Cannon had been on patrol at the time of the robbery and driving his car northbound on Austin Highway two or three miles from the store where the robbery occurred. He received the robbery call over the radio and began driving toward the store. Shortly thereafter, he received the description sent out by Officer Self, and as the description was being broadcast, he saw a 1970 Pontiac with two black males in it who were wearing ball caps and otherwise matched the description. This was approximately three minutes after the robbery occurred. The Pontiac was coming from the direction of the store, and was the only other car on the road at the time. Cannon noticed that it was traveling below the speed limit.

As the two cars passed each other, Cannon applied his brakes and began to turn his car around to follow the men. He noticed that as soon as his brake lights came on, the other car braked and pulled over to the shoulder, but did not stop. Cannon accelerated and pulled in behind the moving car, and saw the passenger's side door open. There was now only one person in the car, and he was in the driver's seat, leaning toward the open door and making motions in that direction, as if throwing something out of the car.

At this, Cannon turned on the overhead flashing lights on his vehicle, but the other car kept moving forward slowly until Cannon, using his loudspeaker system, ordered the driver to stop. Cannon identified appellant in court as the person who had been driving the vehicle. Appellant, when asked at the scene, stated that he did not know where his passenger had gone. Appellant was not wearing his cap when he got out of the car.

When another officer arrived to safeguard appellant, Cannon walked about twenty feet behind the car and found several rolls of coins, some loose change, a pocket knife, a black ball cap, four empty Timex watch cases, and one watch, all of which items were lying on the right shoulder of the road. He radioed the officer at the robbery scene and confirmed that some rolls of change and watches had been taken in the robbery. The area over which the items were scattered was consistent with their having been deposited there by the throwing motions Cannon had seen appellant making.

After receiving the property description from the officer at the robbery scene, Cannon placed appellant under arrest. In a post-arrest inventory of the Pontiac, Cannon found an eight-track car tape deck under the right front seat. The deck had a piece of paper taped to it with a person's name, address, and driver's license number on it. It was later shown to be the same tape deck taken from Elley in the robbery. He then saw a black man walking along Austin Highway across the way from where Cannon was standing. Cannon asked the man to go with him, and along with appellant and the property recovered from the shoulder of the roadway, they went to the robbery scene. Lori Elley identified all of the items as having been taken in the robbery, but neither she nor Dan Jefferson could identify appellant or the other man as having been the robbers. She and Jefferson were similarly unable to identify appellant in court. Elley did identify the merchandise, tape deck, coin rolls, and baseball cap in court, and they were admitted into evidence over appellant's objection and motion to suppress. Elley also testified about having identified a photograph of Michael Wilkins, appellant's first cousin, as having been the gunman.

In addition to the testimony establishing these facts, there was testimony from Bobby Shannon, the manager of the convenience store, that appellant and two other black males had come into the store at

approximately 9:00 p. m. the evening before the robbery. While appellant talked to Shannon at the counter, the other two men looked around the store and looked into the back room of the store, whereupon Shannon told them that area was off limits except to employees. The men then bought some beer and left with appellant. Shannon stated that appellant had engaged him in conversation about some hair curlers while the others were looking around, but when Shannon got the curlers, appellant had said that that was all right, that appellant didn't have the money to pay for them.[1] There was expert testimony that appellant's fingerprints were found on two of the Timex boxes recovered by Officer Cannon along Austin Highway, and also on the watch found there.

The evidence introduced by the defense consisted mainly of the alibi testimony of Michael Wilkins and appellant. Michael Wilkins testified that on the night of September 1, 1977, he, appellant, and a casual friend of theirs named Jim had driven from Austin to San Marcos to meet some women friends of Jim's. When they got to San Marcos, the women were not at home, so they drove on to San Antonio just to look around. Michael admitted that all three went into the convenience store as Bobby Sherman had testified. After leaving the store, they drove around, shot some pool, and drove back to San Marcos, where they found the women at home. They "partied" there until three or four o'clock the next morning, then drove away with Michael driving and appellant passed out drunk in the back seat. Michael and Jim decided to return to the convenience store in San Antonio and commit a robbery.

At this point, Michael's testimony diverged significantly from the State's evidence. He stated that he and Jim left appellant asleep in the car, a few blocks from the store, while they walked over to commit the robbery. Michael testified, in conflict with Elley and Jefferson, that both he and Jim pulled guns during the robbery. Michael testified that when they came out of the store after the robbery, appellant was driving away in the car. They waved him down, got in, and headed south on Austin Highway.[2] By Michael's account, appellant and he were sitting in the front seat and Jim in the back when the police car turned around and came up on them, and that all three were sitting upright. This was in conflict with officer Cannon's testimony that he saw only two men in the car. Michael further testified that he and Jim told appellant to pull over, let them out and throw the "stuff" out of the car. Michael and Jim allegedly ran through the woods for eight or nine hours, then caught a ride back to Austin. Michael was later arrested in Austin, and although he denied at trial that appellant had anything to do with the robbery, he admitted that he had never told any police officers of this prior to appellant's trial.

Appellant gave testimony consistent with Michael's, saying that he got drunk at the party and passed out in the back seat of the car, but woke up to "get sick." He confirmed Michael's statement that he had nothing to do with the robbery, but woke up alone in the car while Michael and Jim were committing the robbery and drove around looking for them. He saw them waving at him, picked them up, and was told that Michael and Jim had just "hit" the store. As they were driving away, a policeman saw them, turned around, and began following them. At this point, they told him to let them out of the car and to throw the stolen goods out. This was what officer Cannon saw him doing.

In rebuttal, the State called officer Dominguez, who had viewed appellant shortly after his arrest. Appellant did not appear intoxicated, and there was no indication of his having thrown up. Officer Cannon also stated that appellant had not appeared intoxicated when arrested.

1. The clear implication of the State's adducing this testimony was that the men were "casing" the store for the robbery that was to occur some eight hours later.

2. Their driving away to the south would appear inconsistent with their wishing to return to Austin, which was to the north from the store.

Appellant in his second ground of error contends that the evidence was insufficient to support the conviction. This is a circumstantial evidence case and the jury was given a charge on circumstantial evidence.

Appellant relies on the inability of Elley and Jefferson to identify him as having been one of the two men who entered the store and robbed Elley. He also argues, and accurately so, that his fingerprints which were found on the stolen items could easily have been placed there in the course of his throwing the items from the car, under his exculpatory version of the incident. Appellant ignores and declines to explain, however, the fact that Officer Cannon saw only two people in the car, although both Michael Wilkins and appellant stated that "Jim" had been sitting in the back seat at the time and that all three were sitting up, thus visible to anyone outside the car.[3] Immediately upon Officer Cannon's turning his car around, appellant pulled over, let out his passenger, and began discarding the stolen property. There was also rebuttal testimony disputing the defensive testimony that appellant had been intoxicated. This, plus the fact of appellant's curious behavior toward Bobby Shannon while in the store the evening before the robbery, was the evidence supporting the State's theory circumstantially linking appellant to the robbery.

In a trial by jury, the jury is the exclusive judges of the facts, and may choose to believe or disbelieve any testimony or other evidence from either side. Tex. Code Crim.Pro.Ann. arts. 36.13 (Vernon 1981) and 38.04 (Vernon 1979); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Cr.App. 1982). In a circumstantial evidence case, the State, by its proof, must exclude every other reasonable hypothesis but the guilt of the defendant. *Autry v. State*, 626 S.W.2d 758 (Tex.Cr.App.1982); *Montoya v. State*, 625 S.W.2d 25, 29 (Tex.App.—San Antonio

1981). The jury obviously disbelieved appellant's version of the events of September 2, 1977, and we hold that the evidence, taken as a whole, justifies their conclusion. Appellant's second ground of error is overruled.

In his first ground of error, appellant contends that the State made evidentiary use of his post-arrest, post-warning silence, in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see also Franklin v. State*, 606 S.W.2d 818, 825 (Tex.Cr.App.1978), reh. denied 1979. He points to allegedly improper cross-examination in which the prosecutor asked why appellant had not told his exculpatory story to Officer Cannon at the time of his arrest. Appellant answered that he did not do so because he had been told of his right to remain silent and had chosen to exercise that right. See Tex.Code Crim. Pro.Ann. art. 38.22, § 2 (Vernon 1979). The prosecutor also alluded in his final argument to appellant's failure to tell Cannon his version of the incident.

As appellant candidly admits, there was no objection either to the cross-examination or the jury argument of which he now complains. He nonetheless argues that there must be a reversal, because the error is fundamental. We disagree.

In *Doyle v. Ohio, supra*, the Supreme Court held that when officers warn a suspect in custody of his right under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to remain silent and not submit to police interrogation, his silence after being so warned is "insolubly ambiguous," because it may be as much the result of his exercise of his *Miranda* rights as it is an indication of the concealment of guilty knowledge. The Court also stated, "Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the

---

**3.** Also, there is no reason to doubt in any way the veracity of Cannon's testimony that there *were only two occupants in the car*. He could have had no reason or opportunity to fabricate his testimony as to this fact, since the defense's theory that there were three, not two, occupants did not come to light until appellant and Michael Wilkins testified. This, of course, was *after* Cannon had testified to having seen only two occupants.

warning." 426 U.S., at 618, 96 S.Ct., at 2245. For these reasons, it was held to be a violation of the Due Process Clause of the 14th Amendment to bring before the fact-finder at trial, over objection, the fact of the defendant's post-arrest and post-warning silence. Thus, the Court clearly based its holding in *Doyle* on its concern that the rights created in *Miranda* might otherwise be diluted in vitality. This being so, the right created in *Doyle* is no more or less "fundamental" than those expressed in *Miranda*. It follows, then, that there is no reason to excuse appellant from the contemporaneous objection requirement that exists for preservation of error as to alleged *Miranda* violations. *See Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex.Cr.App.1974). Appellant's first ground of error presents nothing for review and is overruled.

In his third ground of error, appellant contends that his motion to suppress evidence, specifically the two watch boxes bearing his fingerprints, was erroneously denied and the evidence admitted. He contends that Officer Cannon had no authority to stop the car appellant was driving, and that the watch boxes were tainted fruits of this illegal arrest. His essential argument is that the information known to Cannon at the time he stopped the car was nothing more than the sort of "inarticulate hunch, suspicion or good faith of an arresting officer" which was denounced as insufficient to justify even a momentary restraint of liberty in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We disagree.

When Officer Cannon saw a vehicle approximately three minutes after the robbery, which vehicle was near the vicinity of the robbery and had two occupants matching the description of the robbers being given on the radio that very moment, he turned his car around to investigate. As soon as he hit his brakes, he saw the other car's brake lights come on and saw the car pull over to the shoulder. When he came up behind the car, the passenger door was open, the passenger was gone, and the driver was hurling objects out of the car while the car was still in motion. It was not until Cannon had seen all of these occurrences that he turned on his overhead lights and tried to stop the driver. The driver continued along the shoulder of the road until Cannon ordered him over his loudspeaker to stop. Rolls of coins, watch cases, a watch and a baseball cap were found on the shoulder of the road. Cannon radioed officers at the robbery scene, and received confirmation that the money and merchandise matched the description of the items taken in the robbery. Only at this point did Cannon place appellant under arrest.[4]

We thus disagree with appellant's contention that the only information known to Cannon immediately prior to arresting appellant was the radio-broadcast description of "two black males with ball caps" in a vehicle of unknown description. *Brown v. State*, 481 S.W.2d 106 (Tex.Cr.App.1972), relied upon by appellant, is not in point. In that case, it was held that the officer's stopping the vehicle in question was not justified by his seeing that three of the four occupants matched a general description, by race and approximate height and weight, of three men who had committed a robbery the previous day, plus the fact that the two men in the rear seat started moving their shoulders as if "concealing firearms" as soon as they saw the officer following them. In the case at bar, given that the robbery had occurred minutes, and not a day, before as in *Brown, supra*, that the "ball cap" description was uniquely distinctive, and given the other actions already described, Officer Cannon was justified in ordering appellant to stop the car. We hold that Cannon had specific and articulable facts which, in light of his experience and general knowledge, together with rational inferences from those facts, reasonably warranted the intrusion he made upon appellant's freedom by ordering him out of the car and

---

4. The fact that Cannon later found under the seat of the car the tape deck taken in the robbery is not significant for purposes of this inquiry, as the discovery occurred after appel-

lant had been arrested. *See Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Wilson v. State*, 621 S.W.2d 799, 804 (Tex.Cr.App.1981).

**450**

detaining him for further investigation. *See Terry v. Ohio, supra*, 392 U.S., at 21, 88 S.Ct., at 1880, and *Montoya v. State*, 625 S.W.2d 25, 29 (Tex.App.—San Antonio 1981). Upon finding the items discarded on the roadside and confirming that they had come from the robbery, Cannon had sufficient basis to justify a reasonable person in concluding that appellant had committed the robbery, which is the standard for probable cause to arrest. *Lewis v. State*, 598 S.W.2d 280, 284 (Tex.Cr.App.1980). Under Tex.Code Crim.Pro.Ann. art. 14.03 (Vernon 1977), he had authority to do so without a warrant. *Hamel v. State*, 582 S.W.2d 424, 427 (Tex.Cr.App.1979). Appellant's third ground of error is overruled.

The judgment is affirmed.