Marco ALFARO, Appellant,

v.

The STATE of Texas, Appellee.

and

Kennette KINSER

v.

The STATE of Texas, Appellee.

Nos. 62708, 62709.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 15, 1982.

Albert A. Pena, III, Corpus Christi, for appellant.

Henry Wade, Dist. Atty. and Steve Wilensky, Bob Whaley & Mike Keasler, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

These appeals are from convictions of aggravated robbery. The appellants were indicted separately, but tried together for the robbery of Edward Max. They were represented at trial by the same team of attorneys. The jury found both guilty and assessed punishment in both cases at confinement for twenty years.

Although the record on appeal is not without some confusion, these appellants are now apparently represented by separate attorneys. In No. 62,708, a brief was filed in the trial court which purports to be a brief raising grounds of error for both appellants. Both names are on the cover sheet of the brief, and the trial court docket numbers of both cases also appear thereon. A copy of this brief also appears in the appellate record in No. 62,709.

In addition, in No. 62,709, a separate brief was filed in the trial court which shows only the appellant Kinser's name and case number. Both briefs show that they were timely filed in the trial court and included in the appellate record. However, the record in No. 62,709 contains no response by the State to the grounds raised in the brief filed on behalf of only the appellant Kinser. Since the briefs appear to have been timely and properly filed, we will treat both briefs as raising grounds to be considered as to the appellant Kinser, and only the joint brief as raising grounds to be considered as to the appellant Alfaro.

The complaining witness, Edward Max, testified as follows: He was an officer of Ed Max Salvage, Inc. At some time in early 1978, he and Dell Malone, another officer of the corporation, decided to begin a public relations campaign to boost the company's sales of replacement auto parts. They decided to hire a young woman for the job of calling upon auto parts retailers and new car dealers. They also decided to furnish the woman they hired with a new car as part of the campaign.

Kennette Kinser, one of the co-defendants in this case, worked as a legal secretary for Max's attorney. She overheard Max and his accountant discussing the public relations idea at the attorney's office and called the next day to apply for the job. Max had been impressed with the way Kinser handled her job for the law firm, and the way she dealt with the public. He decided to hire her.

Kinser gave notice to her employer. Between the time she gave notice and the time she began working for Max, Kinser rented a new apartment. Max lent her $1300 to get set up in the new apartment, and gave her the use of a car owned by Malone. Max said the loan was to be repaid at the rate of ten dollars per week, although he did not have Kinser sign any documents in connection with the loan. He did not tell Malone that he had allowed Kinser to use one of Malone's cars.

Kinser was to begin working for Max on Monday, March 13. The Friday before, she picked up the new car which was to be for her use in the new job. The car was a $13,000 Silver Anniversary Edition Corvette.

During the next month, Max became dissatisfied with Kinser's job performance and transferred her to a job in the office where she would be more closely supervised. He was also displeased that the Corvette had been driven so many miles (6000) in such a short period of time. Kinser only worked one day at the office and then did not return to work.

On May 3, Max went to Kinser's apartment to attempt to get a release from her on her oral employment contract. He intended to give Kinser $300 to secure the release. He did not have his attorney draft a release since he thought that he and Kin-

ser would be able to work things out. Max arrived at the apartment about 6:15 p.m. As he approached the house, two men carrying rifles forced him into the house. They claimed to be Arab terrorists, told him that he had no right to live, and threatened to cut his tongue out. One of the men was Marco Alfaro, Kinser's boyfriend and co-defendant in this case.

The men forced him to sit on the couch in the living room. They removed his sweater and shirt. Kinser removed Max's shoes and socks. The men then forced Max to embrace Kinser, pose for pictures, and engage in suggestive conversation with Kinser which they tape recorded.

The men then forced Max upstairs at gunpoint. When they reached the top of the stairs, Max began to struggle with the men. During the struggle, a third man hit Max in the ribs with the butt end of a rifle and Kinser sprayed Max's face with some type of aerosol. Max also saw Kinser remove his billfold from his back pocket.

Max finally broke away from the men and ran outside. Alfaro followed him. The two men sat outside in the driveway talking for awhile. Alfaro demanded that Max give him the keys to Max's car. Alfaro removed a parka from the back seat of the car and covered Max with it. (Max, who was wearing only his pants, had begun shivering.) Alfaro also removed a packet of legal documents from the car.

During their conversation outside, Alfaro told Max that he had invaded his (Alfaro's) home and that he would probably have to destroy him. He then demanded that Max sign a document whereby Max would give Kinser the Corvette and $10,000 as payment for sexual favors performed. When Max said that he could not sign the document without his glasses, Alfaro yelled to Kinser to bring Max's glasses from the house. Kinser did so and Max then signed the document, although upon Kinser's advice, the clause about the $10,000 was deleted.

Max was then allowed to leave. Although Alfaro offered to take him to a nearby "Arab hospital", Max declined the offer. He drove to his salvage yard in Grand Prairie, where Malone was working late. Malone attended to Max's injuries, then took pictures of him and called the doctor in Decatur who treated Max's wife. Malone drove Max first to Fort Worth, where Max lived, then to Decatur, some forty miles from Fort Worth. Max was placed in a hospital overnight.

The next day, Malone called the F.B.I. With Max's permission an agent placed a tap on Max's phone. Three conversations between Max and Kinser were recorded. In one of the conversations Kinser gave Max instructions on where to deliver the car. She told him that a cab would be waiting to take him back to Grand Prairie, and that his "belongings" would be in the cab.

Both Kinser and Alfaro testified in their own behalves. To say the least, their testimony was somewhat different from that given by Max. They testified as follows: Kinser had been employed by the law firm for about three years. During that time she had had coffee with Max many times, and had received a gold necklace from him in 1976. Several times Max had asked her to leave her job and go to work for him. In January, 1978, Max renewed his employment offer during a lunch meeting with Kinser. He offered her a car of her choice, a salary of $13,000 per year, and offered to pay the rent on the apartment of her choice for one year.

Kinser agreed to go to work for Max and gave notice to the law firm. Max gave her the use of a car owned by Malone and told her not to let Malone know that she was using the car. He also told her not to let the law firm know where she was going to work. Max helped her locate her new apartment and went with her when she signed the lease. The $1300 Max gave her was for the first and last month's rent on the apartment and was not a loan. Max told her he would give her the $650 per month rent in cash about the first of every month. Max also told her that he would have the title to the car put in her name by the time of her birthday.

When she began her new job, Max told her that she did not have to begin work each day until about 9:30 a. m., and that she would only have to make three or four calls each day. She learned that the job itself involved offering car dealerships kickbacks if they would buy their parts from Max. On the job, Max followed Kinser around continually, even to the bathroom. He took her out to lunch nearly every day, and occasionally took her out to dinner. In late March, Max gave Kinser $750 in cash. This money included $650 for her April rent as agreed. The extra $100 was for work to be performed in the future on a farm owned by Max. The work was to be "counting cows."

The high mileage on the car was the result of trips to Lubbock and Laredo with Alfaro. Max knew about the trips and did not object to her using the car for personal trips.

At some time in April, Max invited Kinser to accompany him to Las Vegas. She refused to go with him. She told him that she was in love with someone else and that Max was "extremely too old" for her. After that, Max's attitude toward her changed considerably. Shortly thereafter, Max took the car away from her and put her in the office. She did not return to work after the first day in the office because Max repeatedly pinched her "behind."

On May 1, Max went to Kinser's apartment. He gave her a check for $132.45 which was made out to "petty cash" and signed by him. He told her the check was for compensation. This was after Kinser had left the job at the office.

On May 3, Max called Kinser and told her that he was coming by. Alfaro was there at the time. Alfaro called a friend of his and went jogging so that he would not be there when Max arrived.

When Max arrived, Kinser was alone in the apartment. Max first told her what a bad day he had had. Then, as arranged, the two went upstairs to "make love". Kinser had agreed to "make love" to Max so that he would pay her rent and give her back the Corvette. She helped him remove his

sweater. He then removed his shirt, shoes, and socks. Kinser placed his glasses, pen, and billfold on the night table beside the bed. She then removed her shirt. They were lying on the bed discussing who would finish undressing first when Alfaro returned from jogging. During this entire time, Kinser had had a tape recorder recording the entire sequence of events.

When Alfaro saw Max and Kinser on the bed together and partially undressed, he became furious. He and Max began fighting. Alfaro's jogging partner then ran upstairs and tried to separate the men, but was unable to do so. He then ran out of the apartment. Alfaro and Max continued fighting, so Kinser tried to stop them by spraying some dog repellant at both of them. This, too, was unsuccessful. Eventually Max and Alfaro went outside and talked for awhile.

Alfaro was still angry and threatened to call the police. Max apologized for his conduct and pleaded that the police not be called. He offered to give Kinser the Corvette if Alfaro agreed not to call the police. Alfaro agreed to this proposition, but kept the papers from Max's car, Max's shirt, sweater, socks and billfold in order to prove that Max had been there in case he decided to call the police after all.

When Kinser called Max the next day, she asked him to put the car in her name and to bring it to the apartment. She told him that no one would be there and that his belongings would be in a waiting taxi.

■ In her fourteenth ground of error, the appellant Kinser challenges the sufficiency of the evidence. Specifically she alleges that the proof did not show that all the items alleged in the indictment were in fact taken from Max during the robbery. The indictment alleged that seven items, including a watch, were taken from Max during the robbery. At trial, Max testified that he discovered his watch at some time after the robbery, but that he had not reported this fact to the police.

Kinser concedes that *Davis v. State,* 532 S.W.2d 626 (Tex.Cr.App.1976), is adverse to this contention. In that case, the court stated:

"In a robbery prosecution it is not necessary to prove that all the property alleged was taken. Proof that any part thereof was taken is sufficient. *Sirls v. State,* 511 S.W.2d 55; *Smallwood v. State,* Tex. Cr.App. 464 S.W.2d 846; *Hoover v. State,* Tex.Cr.App., 390 S.W.2d 758. While the foregoing cases were decided under the old Penal Code, we perceive no difference in this respect under the new Penal Code." 532 S.W.2d at 629.

Kinser invites us to overrule this rule. We decline the invitation. The evidence is sufficient.

In her ninth ground of error, the appellant contends that the record fails to show that the "special judge" who tried this case had any authority to do so. In support of this contention, the appellant cites *Parker v. State,* 390 S.W.2d 774 (Tex.Cr.App.1965), and *Davis v. State,* 157 Tex.Cr.R. 146, 247 S.W.2d 392 (1952). Those cases are not on point. They deal with special judges who preside over a case under the terms of V.A.C.S. Articles 1885–1893 and 1930–1934, and V.A.C.C.P., Article 556 (now Article 30.05).

Judge Ed Gossett, who tried the case, was not a special judge within the meaning of those statutes. Rather, he was a retired judge who had elected to continue in a judicial capacity. *See* V.A.C.S., Articles 200a and 6228b, Section 7 (now Sections 42.101 and 42.102 of Title 110B, Acts 1981, 67th Leg., Chapter 453, effective September 1, 1981). Such a judge is a "district judge" within the rule that no formal order need be entered for a judge of one district court to preside over a case in place of a duly elected judge. *Crawford v. State,* 509 S.W.2d 582 (Tex.Cr.App.1974); *Peach v. State,* 498 S.W.2d 192 (Tex.Cr.App.1973); *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr. App.1971), cert. denied, 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804. Further, we have held that we will take judicial notice that a judge had retired on a certain date

and that he had timely filed his election to continue in a judicial capacity. *Crawford,* supra; *Peach,* supra; *Buchanan,* supra.

We take judicial notice that the records of the Chief Justice of the Supreme Court of Texas indicate that Judge Gossett retired on December 31, 1976. Those records also show that Judge Gossett's election to continue in a judicial capacity was acknowledged on January 5, 1977. The ground of error is overruled.

In six grounds of error, the appellant Kinser challenges the admissibility of oral statements made by both her and her co-defendant in response to custodial interrogation. After the defense witnesses had completed their testimony, the State called a number of rebuttal witnesses. Two of these witnesses were law enforcement officers who were asked about statements made by Kinser and Alfaro in response to custodial interrogation.

George Clow, an F.B.I. agent, testified that he spoke with Kinser at the University Park Police Department three days after she was arrested. According to him, Kinser told him that Max had tried to rape her on the evening of May 3. She also told Clow that she did not know where Max's billfold was. These statements contradicted Kinser's trial testimony that she had agreed to "make love" to Max, and that he had removed his billfold and placed it on the night table next to the bed. She had also testified that she had placed Max's billfold, along with his other belongings, in a closet in her bedroom after Max had left the apartment that night.

Ray Fletcher, a University Park police officer, testified that he questioned Marco Alfaro at the police department on the evening of the arrest. He asked Alfaro who was present at the apartment at the time of the alleged robbery. Alfaro told him that only he, Kinser, and Max were present. Alfaro also told him that he had left the apartment on his motorcycle when he learned that Max was coming to the apartment, and that when he returned he heard Kinser pleading with Max upstairs. He

suspected that something was wrong and ran upstairs to the bedroom where he found Max partially undressed.

Fletcher also testified that, in response to questions, Kinser had also told him that only three people were present in the apartment and that Max had tried to rape her.

These statements were made to two different law enforcement officers at different times. All the statements were clearly made in response to custodial interrogation, and none were reduced to writing or recorded. Kinser argues that V.A.C.C.P., Article 38.22, Section 3, controls the admissibility of oral statements which were made in response to custodial interrogation, and that since the requirements of that section were not met, these statements were not admissible for any purpose. The State argues that the statements were properly admissible for impeachment purposes under the provisions of V.A.C.C.P., Article 38.22, Section 5.

Article 38.22, Section 3, provided: [1]

"Sec. 3. (a) An oral or sign language statement of an accused made as a result of custodial interrogation is admissible against the accused in a criminal proceeding for the purpose of impeachment only and when:

"(1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

"(2) prior to the statement but during the recording the accused is told that a recording is being made;

"(3) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

"(4) the recording device was capable of making an accurate recording, that the operator was competent, and that the recording is accurate and has not been altered;

"(5) the statement is witnessed by at least two persons; and

"(6) all voices on the recording are identified.

"(b) Every electronic recording of any statement made by an accused during custodial interrogation must be preserved until its destruction is permitted by order of a district court of this state.

"(c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

"(d) If the accused is a deaf person, the accused's statement under Section 2 or Section 3(a) of this article is not admissible against the accused unless the warning in Section 2 of this article is interpreted to the deaf person by an interpreter who is qualified and sworn as provided in Article 38.31 of this code."

Article 38.22, Section 5, provides:

"Sec. 5. *Nothing in this article precludes the admission* of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or of *a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness,* or of any statement that may be admissible under law." (emphasis added)

As a matter of statutory construction, we must now attempt to resolve the apparent conflict between these two provisions. The Code Construction Act, V.A.C.S., Article 5429b–2, contains guidelines relevant to our task. Among these are:

"Sec. 3.01. In enacting a statute, it is presumed that

[1]. V.A.C.C.P., Article 38.22, Section 3, was amended by Acts 1981, 67th Leg., p. 711, ch. 271, Sec. 1, eff. Sept. 1, 1981.

"(1) compliance with the constitutions of this state and the United States is intended;

"(2) the entire statute is intended to be effective;

"(3) a just and reasonable result is intended;

"(4) a result feasible of execution is intended;  and

"(5) public interest is favored over any private interest.

\*       \*       \*       \*       \*       \*

"Sec. 3.03. In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the

"(1) object sought to be attained;

"(2) circumstances under which the statute was enacted;

"(3) legislative history;

"(4) common law or former statutory provisions, including laws upon the same or similar subjects;

"(5) consequences of a particular construction;

"(6) administrative construction of the statute;  and

"(7) title, preamble, and emergency provision.

\*       \*       \*       \*       \*       \*

"Sec. 3.06. ₇If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail."

In *Butler v. State,* 493 S.W.2d 190 (Tex. Cr.App.1973), this court exhaustively reviewed former statutory provisions relating to the admissibility of oral statements made by the accused while in custody, a review we need not repeat here. At the time the case was decided, such an oral statement was admissible under only under three circumstances:

"(1) where it be shown to be the voluntary statement of the accused taken in an examining court (Sec. 1(a));

(2) where the accused makes an oral statement of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed (Sec. 1(e));  or

(3) where the oral statement was 'res gestae of the arrest or of the offense' (Sec. 1(f))." *Id.* at 193.

In addition, the court noted:

"For over seventy-five years, the law in Texas has been that a confession, inadmissible in the State's case in chief, is not admissible for the purpose of impeaching an accused as a witness in his own behalf. 1 Branch's Ann.P.C., 2d ed., Section 96, p. 107. If not admissible as original evidence as a result of the statute, then it is not available for impeachment purposes even if the defendant has taken the witness stand. And, this is true even though the defendant, in taking the stand as a witness, is normally subject to the same rules as any other witness." *Ibid.*

This statutory exclusion of oral statements made while in custody was a legislative determination that such statements are "generally unreliable". *Ibid.* Given this legislative determination, the court refused to apply the holding of *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), as a matter of state law. In *Harris,* the United States Supreme Court had held that, as a matter of federal constitutional law, a defendant may be impeached by a confession which does not comply with the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as long as "the trustworthiness of the evidence satisfies legal standards." 401 U.S. at 224, 91 S.Ct. at 645.

In rejecting the State's contention that Article 38.22 should not be read to bar the use of confessions for impeachment which would not be admissible as evidence, the *Butler* court held that the legislature had already decided that oral confessions were

not generally trustworthy. As the court put it:

"Even if *Harris* is correct in holding that the mere absence of *Miranda* warnings and waiver does not affect the reliability of 'trustworthiness' of a confession, it does not follow that proof of oral confessions in Texas state criminal proceedings not taken in compliance with the confession statute can be considered equally as 'trustworthy.' Indeed, this court cannot so hold in face of the statutory policy to the contrary. As earlier noted, the Legislature in Article 38.22, supra, has made the statutory determination that testimony surrounding oral confessions made while in custody or confinement is unreliable with certain statutory exceptions. As earlier noted, it has been said that this perceived evil arises because oral confessions are ' " . . . so liable to be misunderstood, so easily fabricated and so hard to be contradicted." ' *Pierson v. State,* supra, 168 S.W.2d 256 at 259.

"This statutory exclusion is not a constitutional requirement, either state or federal, and the wisdom of this legislative policy is, of course, not a matter for this court. To permit testimony as to an oral confession (not within any statutory exception) for impeachment would undermine the legislative determination expressed in Article 38.22, supra. 'Harris, of course, in no way obligates these (state) courts to overturn prior decisions as a matter of state criminal procedure.' Note, 49 Tex.L.Rev. 1119, 1125 (1971). The exclusion of oral confessions stands on a different footing than the *Miranda* error involved in *Harris.*

"Therefore, we cannot agree with the State's contention despite the natural temptation to rush to embrace the *Harris* rationale. The beauty is only skin deep.

"Although the *Harris* decision, sanctioning the use of otherwise inadmissible statements for impeachment purposes provided the trustworthiness of the evidence satisfies legal standards, would provide persuasion for changing Article 38.22, supra, until those changes are made that statute would control the use of prior statements for impeachment and it was error to permit the impeachment in this case." 493 S.W.2d at 198 (footnotes omitted).

Thus, as the *Butler* court showed, oral statements made by the accused while in custody have long been regarded by the legislature as generally unreliable and, therefore, inadmissible for any purpose. Although Article 38.22 contained three exceptions to the general rule of admissibility, those exceptions involved narrow circumstances when the risks of misunderstanding, easy fabrication, and difficulty of contradiction were not nearly so great.

In 1977, the Legislature amended Article 38.22. For the first time since 1907, see *Butler,* supra, at 192, oral statements made while in custody became admissible for impeachment purposes even when they did not fall within one of the three previous statutory exceptions. However, as noted above, Section 3 appears to require that six specific provisions be met before an oral statement made as a result of custodial interrogation can be used for impeachment, while Section 5 appears to authorize the use of any in-custody oral statement for impeachment purposes which is shown to be voluntary.

We turn now to the legislative history of the 1977 amendments to Article 38.22 in our attempt to resolve this apparent conflict. These amendments (as well as certain other amendments to Articles 38.21 and 38.22 which are not relevant here) were contained in Senate Bill 157. As originally proposed, both oral and written statements made while the accused was in custody would have been admissible "as evidence against him in any criminal proceeding" as long as the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), had been given. In addition, an oral statement would have been required to have been reduced to writing within forty-eight hours. What is now Section 5 was contained in the original draft. As originally proposed, the bill would have brought Texas law concerning oral confessions in

line with federal law: oral confessions could be used as evidence when taken in compliance with *Miranda* and for impeachment when the requirements of *Miranda* have not been met.

The bill was referred to the Senate Jurisprudence Committee. That committee substituted its own version of the bill. The substitute bill added a section which ultimately became Section 3. The committee substitute also retained the requirement that the oral statement be reduced to writing within forty-eight hours. Thus, under the committee substitute, an oral statement by the accused which was the result of custodial interrogation not only had to be recorded, with the procedural safeguards set out in what is now Section 3, but also had to be reduced to writing within forty-eight hours after it was given. However, in addition, the committee substitute retained the provision which ultimately became Section 5.

The committee substitute passed the Senate and was sent to the House. In the House it was referred to the Criminal Jurisprudence Committee. That committee altered Section 3 to allow an oral statement which was recorded and which otherwise met the procedural safeguards to be used as evidence against the accused. The committee also deleted the requirement that the oral statement be reduced to writing.

On the House floor several amendments altered slightly the language of the warnings which had to be given the accused and added what is now Section 3(b) which requires the recording of an oral statement to be preserved. As amended, the bill passed the House.

When the Senate refused to concur in the House amendments, a Conference Committee was appointed to resolve the differences. The Conference Committee accepted the House version of the bill except for the provision in Section 3 that the oral statement could be used as evidence. The committee reinstated the Senate's version that the oral statement could only be used for impeachment. The Conference Committee's version was accepted by both the House and the Senate, and signed by the governor.

This legislative history suggests to us that the historic concern for the reliability of oral confessions was still alive and well during the 65th Session of the Legislature. Although for the first time in 70 years the Legislature, in Section 3, authorized the use of oral statements made by the accused as a result of custodial interrogation, it did so only with carefully delineated safeguards set out in the statute. These safeguards seem designed to insure the voluntariness and accuracy of the statement, and to allow the trier of fact to hear, and possibly see, the accused during the taking of the statement. Furthermore, the Legislature rejected the attempt to authorize the use of oral custodial statements as evidence against the accused. However, as we have noted, what is now Section 5 was contained in all the versions of the bill. We must still resolve the apparent conflict between its blanket authorization of the use of voluntary statements for impeachment purposes and the detailed requirements of Section 3.

It is the State's contention in this case that there is no conflict between the two sections. According to the State,

"Sec. 3 is meant to apply when the accused elects not to testify. Sec. 3 simply states that oral statements of the accused, when properly recorded, are admissible for the purpose of impeachment only. Thus, when the accused elects not to testify, but instead offers other defensive testimony which is inconsistent with a prior oral statement made by him, the State may impeach that evidence with his prior contradictory statement, where the six precedent conditions are met. The imposition of these conditions upon the State is understandable when the oral statement is being used for impeachment generally and not merely against *testimony of the accused.* For having chosen not to testify, rigorous standards are set up for the admissibility of an accused's oral statement, since he otherwise could be forced to testify in order to attempt to defeat the oral statement. In other

words, if the State proves the precedent conditions, the recorded oral statement rises to a level of irrefutability. And when offered merely to impeach other testimony, the Legislature demanded such a high degree of reliability. And, as in the past, reliability is presumed where the statement contains facts found to be true which conduce to establish guilt.

"That situation is in contrast to that found in Sec. 5. Here, any voluntary statement (assuming res gestate [sic] statements are inherently voluntary), is admissible when it has a bearing on the credibility of the accused *as a witness*. (As opposed to the admissibility against the accused when it has a bearing on the credibility of *any defensive testimony*.) The wisdom of this section is readily apparent. When the accused elects to testify, he immediately puts his credibility as a witness in issue. If he testifies to a circumstance contrary to a circumstance about which he has previously made a voluntary statement, that contradictory statement becomes admissible to defeat his credibility as a witness.

"In the case of an oral statement made as a result of custodial interrogation, where such a statement is offered pursuant to Sec. 5, it is being offered not so much to prove the truth of the matter asserted, but as bearing upon the accused's credibility." (emphasis in original)

In other words, under the State's construction of the statute, if Witness A testified that the accused said, "X", the State would have to comply with the requirements of Section 3 in order to show that in his custodial statement, the accused said, "Y". However, if the accused himself said, "X" at trial, the State need only show that the statement was voluntary in order to show that in his custodial statement, the accused said, "Y". We find this construction to be implausible for several reasons.

First, as indicated above, this State has long looked upon oral custodial statements with suspicion. Given that history, we see no reason to impute to the Legislature a

lesser degree of concern for the reliability of an oral custodial statement when the accused himself testifies than when another witness testifies.

Second, as indicated above, the bill which amended Article 38.22 underwent several revisions before its enactment. In its original version, and in its House version, oral custodial statements would have been admissible as evidence against the accused. The Senate version of the bill, and the bill as ultimately enacted, limited the admissibility of oral custodial statements to impeachment. Nothing in this legislative history suggests that Section 3 should be limited to the narrow reading urged by the State in this case. Indeed, the legislative history suggests the contrary; that oral custodial statements could be used only for impeachment and only when the six specific requirements of Section 3 were met.

■ Third, by the Code Construction Act, Section 3.06, set out above, we are bound by the rule that a specific provision prevails as an exception to a general provision. Section 5 appears to authorize the admission of any "voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness." Section 3, on the other hand, applies only to oral statements made by the accused as a result of custodial interrogation which are used for impeachment. Section 3, therefore, is the more specific provision. Section 3 must prevail as an exception to the general authorization contained in Section 5.

■ For all these reasons, we hold that as amended in 1977, V.A.C.C.P., Article 38.-22, Section 3, controls over Section 5. An oral statement made by the accused as a result of custodial interrogation during the effective dates of that statute (August 29, 1977 through August 31, 1981) is admissible only for impeachment purposes and only when the statement is shown to comply with the six specific requirements contained in Section 3. V.A.C.C.P., Article 38.22, Sec-

tion 5, applies to statements other than oral custodial statements made by the accused.[2]

Although the State does not cite *Girndt v. State,* 623 S.W.2d 930 (Tex.Cr.App.1981), we acknowledge that certain language in Judge Teague's opinion would support the State's position in this case. However, we do not regard that opinion as controlling authority.

As pointed out in Judge Clinton's dissenting opinion in *Girndt,* the oral statements used for impeachment in that case were not the result of custodial *interrogation.* Although they were made by the defendant while in custody, they came "during a somewhat argumentative exchange with Trooper Potvin in the patrol unit enroute to the Bell County jail." 623 S.W.2d at 936. Article 38.22, Section 3, applies to an oral statement of the accused made as a result of custodial interrogation. Therefore, as pointed out by Judge Teague, Section 3 was not applicable to the facts of the case. 623 S.W.2d at 932. The broad language about the Legislature's intent in enacting V.A.C. C.P., Article 38.22, Section 5, and about the effect of Section 5, is dictum not necessary to the result of the case.

■ As should have been obvious from our rendition of the conflicting versions of what took place in Kinser's apartment on the night of May 3, 1978, the credibility of the witnesses was critical to the resolution of the conflicts. In light of this critical role which credibility choices played in this trial, we cannot say that the admission of the oral statements of Kinser and Alfaro was harmless error. Their admission undoubtedly played a crucial role in undermining the credibility of the two co-defendants. We must, therefore, reverse the conviction of the appellant Kinser, and remand the case for a new trial. In light of this disposition, we need not address Kinser's remaining grounds of error.

The appellant Alfaro does not challenge the admissibility of all the statements challenged by Kinser. However, he does contend that Clow's testimony concerning statements made by Kinser to him was inadmissible. For the same reasons as set out above, we cannot conclude that the admission of the statement was harmless error.

The State argues that Alfaro has failed to preserve error. First, argues the State, "no objection to these statements was lodged as they concerned [Alfaro]." This argument has no merit. The record shows that Kinser and Alfaro had the same team of attorneys at their joint trial. No one at trial treated the objection as applying to only one of the co-defendants.

Second, the State argues that Alfaro did not request an instruction "excluding Kinser's statements from the consideration of [Alfaro's] guilt." Had such an instruction been requested, the trial court could properly have refused to give it. The credibility of a witness for the accused should properly be considered by the jury in its decision concerning the accused's guilt or innocence. When Kinser took the witness stand, she did so both as a witness in her own behalf, and as a witness for her co-defendant. When she was impeached, thus making her testimony less credible, her guilt, and that of her co-defendant, became more likely.

In light of our disposition of this ground of error, we need not consider the remaining seven grounds of error raised by the appellant Alfaro.

The judgments of conviction as to both appellants are reversed, and the cases are remanded for new trials.

---

**2.** Of course, we express no opinion concerning the interplay between Sections 3 and 5 as currently enacted.