Kelly Joe CHAMBLISS, Appellant,

v.

The STATE of Texas, Appellee.

No. 569–82.

Court of Criminal Appeals of Texas, en banc.

Feb. 16, 1983.

Mary Lou Cassidy, court appointed, Midland, for appellant.

Vern F. Martin, Dist. Atty. and Robert L. Sutphen, Asst. Dist. Atty., Midland, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

After a jury trial, appellant was found guilty of murder and sentenced to ninety-nine years in prison. His appeal was originally to this court, but after the 1980 amendments to Article Five of the Texas Constitution altered the state's appellate framework, we transferred the cause to the Eighth Supreme Judicial District Court of Appeals. Rejecting all of appellant's eleven grounds of error, that court affirmed his conviction. *Chambliss v. State,* 633 S.W.2d 678 (Tex.App.—El Paso, 1982). We granted appellant's petition for discretionary review, primarily to consider his bold contention that under Section Five of Article 38.-22, V.A.C.C.P., as amended in 1977, oral statements that do not "stem from custodial interrogation" are admissible only for the purpose of impeachment.

We begin by setting out the facts pertinent to this contention. Appellant was arrested for murder on July 19, 1979, and placed in the Midland County jail. On that date, one Gary Dwayne King was incarcer-

ated in tank 3 of the jail, charged with burglary, attempted burglary, and misdemeanor theft. King testified at trial that he met appellant on July 25th, 26th, or 27th, when he approached appellant because "Midland County jail don't allow you to smoke and he came in with a package of cigarettes . . . ." Until that time, appellant had apparently been kept in a single cell, and King had not seen him before.

For no reason "other than curiosity," King testified, he brought up the subject of the murder charge against appellant.[1] In the conversation that followed, appellant gave a detailed account of his activities on the night of the murder, concluding that the confession that he had personally shot the victim, Sergeant J.B. England. According to King, however, appellant had told him he was thinking about giving a false statement blaming his co-defendant, Raymond Mathis, for the murder, in retaliation for a statement Mathis had made. Finally, King related that appellant had said that the murder "wasn't on his conscience, that maybe it should be, but it wasn't."

According to King, another "jailmate," Roger Browning, witnessed his conversation with appellant. Browning himself did not testify, however; King said Browning had been "transported" to Shreveport, Louisiana. King denied that at the time he talked to appellant, he had any intention of alerting "the authorities" of anything he might learn. It was not until a few days later that it occurred to him that he might mention the conversation to Captain Tony

Roye, a jailer with whom King "always got along good." On cross-examination, King admitted that he later went to the district attorney "partly" because the information might gain him something, but disclaimed any knowledge of a plea bargain and said he had been promised nothing. It was brought out, though, that after telling of his conversation with appellant, King was released on bail, ending over a month's stay in jail. At the time of trial, moreover, King was staying at the Sheraton, with the district attorney's office "picking up the bill."

Appellant concedes that since King was not a police officer and no "interrogation" occurred, his statement to King did not "stem from custodial interrogation" within the meaning of Article 38.22, § 5, V.A.C. C.P.[2] Arguing that the legislative history of Article 38.22 is not a history of "people who have great faith in the honesty of mankind," however, appellant urges that Section 5 be construed so that "jailhouse conversations and other overheard remarks" would be admissible only to impeach a defendant who testifies, and not as substantive evidence of guilt offered in the State's case-in-chief. According to appellant, it is "preposterous" to believe that such statements were meant to be admissible on the question of guilt or innocence, so that "anyone can now testify about anything the defendant says in custody, so long as he is not being interrogated, even though the person so testifying is jailed for a crime and has a strong motive for pleasing the prosecution by what he says on the stand."[3]

1. Appellant was indicted for this offense without much delay—on July 20, 1979, just one day after he was arrested and two days after the murder. As to how King knew that appellant was charged with murder, the record is silent.

2. No fifth amendment claim is made, and appellant does not assert that *Miranda* is applicable here; clearly, it is not.

3. Although couched in terms of a statement made to a fellow prisoner, appellant's argument presumably encompasses any statement made in "custody," no matter to whom. In this connection, however, appellant does not cite or make any mention of *Autry v. State,* 626 S.W.2d 758 (Tex.Cr.App.1982), where we upheld the admissibility of a telephone conversa-

tion between the defendant and his mother, a conversation overheard while the defendant was in custody at the police station. While appellant is correct in observing that the oral statement at issue in *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981), was used only for impeachment purposes (the result he urges), the statements in *Autry* appear to have been offered as substantive evidence of guilt, for Autry himself apparently did not testify. Other than the omission of *Autry,* however, appellant's brief is quite commendable, and we proceed on the assumption that he wants us to overrule *Autry,* for, as will be seen, his argument does not depend upon a cellmate interlocutor.

The key to appellant's argument is an imaginative reading of Section 5 of Article 38.22. At the time appellant allegedly unburdened himself to Gary King, Article 38.-22 provided, in pertinent part:

"Sec. 3. (a) An oral statement of an accused made as a result of custodial interrogation is admissible against the accused in a criminal proceeding for the purpose of impeachment only and when:

(1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2) prior to the statement but during the recording the accused is told that a recording is being made;

(3) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(4) the recording device was capable of making an accurate recording, that the operator was competent, and that the recording is accurate and has not been altered;

(5) the statement is witnessed by at least two persons; and

(6) all voices on the recording are identified.

(b) Every electronic recording of any statement made by an accused during custodial interrogation must be preserved until its destruction is permitted by order of a district court of this state.

(c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

Sec. 4. When any statement, the admissibility of which is covered by this article, is sought to be used in connection with an official proceeding, any person who swears falsely to facts and circumstances which, if true, would render the statement admissible under this article is presumed to have acted with intent to deceive and with knowledge of the statement's meaning for the purpose of prosecution for aggravated perjury under Section 37.03 of the Penal Code. No person prosecuted under this subsection shall be eligible for probation.

Sec. 5. Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, *that has a bearing upon the credibility of the accused as a witness,* or of any other statement that may be admissible under law." Tex.Code Crim.Pro.Ann., Art. 38.-22 (Vernon 1979) (Appellant's emphasis)

Emphasizing the restrictive clause, "that has a bearing upon the credibility of the accused as a witness," appellant contends that this clause should be read to modify not just the words, "or of a voluntary statement, whether or not the result of custodial interrogation," but also the words, "or of a statement that does not stem from custodial interrogation." Under appellant's construction, then, Section 5 would read, in pertinent part: "Nothing in this article precludes the admission of ... a statement that does not stem from custodial interrogation ... that has a bearing upon the credibility of the accused as a witness...." Thus rearranged, Section 5 would restrict the use of statements not stemming from custodial interrogation (be they to cellmates or not) to impeachment purposes only.

Grammatically speaking, it might seem that the clause, "that has a bearing upon the credibility of the accused as a witness," qualifies or restricts only the immediately preceding words, "or of a voluntary statement, whether or not the result of custodial interrogation." Appellant seems to concede that this interpretation is natural, but im-

plicitly argues that his reading is also grammatically possible (a conclusion we will accept, without resort to the byegone practice of "diagramming," whereby sentences were broken into their component parts to see what words "went with" what). In this connection, appellant maintains that we should not apply a venerable doctrine of statutory construction: the "Doctrine of Last Antecedent," whereby "a qualifying phrase must be confined to the words and phrases immediately preceding it to which it may be applied without impairing the meaning of the sentence. . . ." *City of Corsicana v. Willman,* 147 Tex. 377, 216 S.W.2d 175, 176 (1949). If that doctrine were applied here, of course, the pertinent part of Section 5 would be read this way: "Nothing in this article precludes the admission of . . . a statement that does not stem from custodial interrogation . . ."—period.

There is more here than it might seem. As appellant says, the real issue is legislative intent. Citing *Easley v. State,* 493 S.W.2d 199 (Tex.Cr.App.1973), appellant rightly points out that before Article 38.22 was amended in 1977, "cellmate testimony" like King's would have been inadmissible *for any purpose.* This was so because under the pre-1977 statute, an oral statement made in jail or in custody was admissible only if it fell within one of three exceptions to the general rule of inadmissibility:

(1) where it was a voluntary statement taken in an examining court;

(2) where it was a statement of facts and circumstances found to be true which conduced to establish the defendant's guilt; or

(3) it was a statement that was "res gestae" of the arrest or of the offense. *Butler v. State,* 493 S.W.2d 190, 193 (Tex.Cr. App.1973).

Since statements made to one's cellmate did not fall within one of these three categories, they were not admissible for any purpose, and so *Easley* held. *Id.* at 493 S.W.2d 200.

Appellant points out that although Article 38.22 was amended in 1977, the amendments did not expressly overrule *Easley,* but simply added three new exceptions to the general rule of inadmissibility: "[1] a statement which does not stem from custodial interrogation, or [2] of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or [3] of any other statement that may be admissible under law." And while many commentators assumed that statements that did not stem from custodial interrogation would be admissible as substantive evidence, *See, e.g.,* Bubany, *The Texas Confession Statute: Some New Wine in the Same Old Bottle,* 10 Tex.Tech.L.Rev. 67 (1978), commentators have failed before in their attempts to plumb the intricacies of Article 38.22. *Cf.* Bubany, supra, at p. 81, declaring that the "apparent effect" of the new Section Five was to overrule *Butler v. State,* and adopt *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Alfaro v. State,* 638 S.W.2d 891 (Tex.Cr. App.1982) (under the 1977 version of Article 38.22, voluntary oral statements that are the result of custodial interrogation are not even admissible for impeachment unless they are electronically recorded).

Not without some justification, appellant reminds us of what we said in *Butler* about the legislature's perennial distrust of oral statements made in custody, *Id.* at 493 S.W.2d 198, and of our more recent statement in *Alfaro* that "the historic concern for the reliability of oral confessions was still alive and well during the 65th Session of the Legislature." *Alfaro,* supra, at 638 S.W.2d 899. Given this legislative history, appellant submits, it does not make sense that the same legislature which confined the use of statements made as a result of custodial interrogation to impeachment (and then only if they were recorded), should at the same time intend to reject *Easley* and for the first time in Texas history allow "jailhouse conversations" to be admitted not just to impeach, but as evidence of guilt.[4]

---

4. Appellant notes that the original bill proposed

in the 1977 legislature would have permitted

Finally, appellant warns that if the "rather cryptic and abstruse language" of Article 38.22 is not read to limit the use of oral custodial statements to impeachment, the "sport of jailhouse snitching" will become a state pastime. According to appellant, while the "ties between prosecutor and prisoner will probably remain quite unofficial" lest convictions be reversed under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), an informal "back-scratching" system will develop, nourishing the inchoate interest in law enforcement of prisoners like Gary Dwayne King. As a result, the "permissible limits of such relationships between informer and the prosecution will have to be defined by this court," a problem that did not trouble us in the days of *Easley.*

Although appellant's argument is a brave one, we must reject it. In our view, the key language in Article 38.22 is not the clause, "that has a bearing upon the credibility of the accused as a witness." Instead, the real indicator of legislative intent is the term, "custodial interrogation." Until 1977, Article 38.22 applied to confessions made while "the defendant was in jail or other place of confinement or in the custody of an officer. . . ." Art. 38.22, V.A.C.C.P. (Vernon 1966). As can be seen, this language omits any requirement that the statement stem from "interrogation." By contrast, after Article 38.22 was amended in 1977, the old language was changed so that "custody" itself would not invoke the protections of the statute: Section 3(a) spoke of an "oral statement of an accused made *as a result of custodial interrogation,"* and Section 5 created new exceptions for a statement that

did not "stem from *custodial interrogation"* or a "voluntary statement, *whether the result of custodial interrogation or not,"* that had a "bearing upon the credibility of the accused as a witness." [5] (Emphasis supplied)

In short, we are convinced that the repeated use of this new language in 1977 did indeed signal a departure from prior legislative intent. Professor Bubany has summarized the matter well:

"Under the prior law the trigger for statutory limitations on 'custodial' statements was the two-dimensional concept of actual custody—whether the accused was 'in jail or other place of confinement or in the custody of an officer.' Whether made in response to an official interrogation or not, a statement of the accused while in custody was *ipso facto* inadmissible unless it was preceded by the appropriate warnings and waiver. In the case of an oral statement, it was *ipso facto* inadmissible unless it fell within one of the statutory exceptions.

\* \* \* \* \* \*

"The statutory change from a focus on the fact of custody to an inquiry of whether the statement is the product of a custodial interrogation will have little impact on the law of *written* confessions. Its real effect will be on the admissibility of oral statements. One effect of the new statute is to overrule *Easley v. State* and its progeny. *Easley* held that statements made to a fellow jail inmate concerning a crime for which the accused was in custody must meet the requirements of Article 38.22 to be admissible.

---

oral confessions for impeachment only if a written memorandum of the confession was made within 24 hours and sworn to by two witnesses before a magistrate. This provision would have applied to statements made to cellmates as well as to police officers. Bubany, supra, at p. 96. Although the legislature rejected this approach and opted instead for the electronic recording procedure, appellant observes that the rejection of the original bill is not "conclusive proof" that the legislature meant to reject that part of the bill treating conversations with prisoners and police officers alike.

5. We also note that Section 2 introduced the same concept as far as written statements: written statements "made by an accused *as a result of custodial interrogation* " were subject to certain restrictions. This reinforces our belief that just as the essential wording under the pre-1977 statute was "in jail or other place of confinement or in the custody of an officer," no matter whether the statement was oral or written, under the 1977 version the operative words are "custodial interrogation," no matter whether a statement be oral or written.

Statements of this type are 'custodial,' in the sense that they are post-arrest and made while in custody, but under the new law they would not be 'a result of' or 'stem from' a custodial *interrogation.*" Bubany, supra, at pp. 73–74. (Footnotes omitted)

Thus, we conclude that while the 1977 legislature was still concerned with the reliability of oral statements, its concern was with oral statements resulting from custodial interrogation, not simply statements made in custody. Appellant's interpretation not only ignores the prominence of the new language, but, as he concedes, might "well have adverse effects upon the other clauses in the section [five], the in-court statements and the res gestae statements." For if the words, "that has a bearing upon the credibility of the accused as a witness," are to apply to or modify the words, "a statement that does not stem from custodial interrogation," what words in Section 5 do they *not* apply to? Under what might be called appellant's "floating modifier" theory, Section Five could be read, for example, to say that "Nothing in this article precludes the admission of a statement made by an accused in open court at his trial . . . that has a bearing upon the credibility of the accused as a witness."

Whatever else the legislature intended, we are confident that they did not mean for a judicial confession to be limited to impeachment (if that can be conceived of). And yet if this reading is obviously untenable, it only demonstrates the weakness of trying to read in the clause, "that has a bearing . . .," whenever one supposes the legislature meant to do so. Let the legislative intent be demonstrated, and we would agree with appellant that "sloppy draftsmanship"[6] might be overlooked; we are unwilling, however, to ignore the importance of the new concept of "custodial interrogation," and cannot divine that appellant's reading was meant. Thus, even though testimony like that here may be unreliable, and even though *Massiah* may not afford enough protection,[7] those are matters for the legislature, the legislature itself having changed the law. Accordingly, we reject appellant's first ground for review, and hold that statements which are not "the result of" or do not "stem from" custodial interrogation are admissible under Article 38.22 on the question of guilt, and not merely to impeach a defendant who testifies.

Appellant's second ground for review also concerns a conversation—a conversation be-

**6.** We agree that the 1977 version of Article 38.22 is not overclear. We also acknowledge that even after our decision today, the language of the 1977 Section 5 may still seem something like Rubik's cube. In *Alfaro,* for example, we distinguished oral statements that *were* "the result of" custodial interrogation from those which were not: the former type are subject to the recording requirement of Section 3. But what of statements *not* "the result of custodial interrogation"? Are they not the same as statements that do not "stem from custodial interrogation"? If the answer is yes (as we think it must be), then one might envision a new problem: a voluntary statement "not the result of custodial interrogation" that had "a bearing upon the credibility of the accused as a witness" would be admissible for that very reason—impeachment. A statement that did not "stem from" custodial interrogation (the same thing), would nevertheless be admissible *substantively* (because of our holding here that the clause, "that has a bearing on . . ." does not apply to statements that do not "stem from" custodial interrogation). The conflict is only apparent, however, because statements

that are not "the result of" or do not "stem from" custodial interrogation can be admissible *both* substantively and to impeach. While this interpretation renders Section 5 somewhat redundant (the legislature might have said, "or of a voluntary statement that is the result of custodial interrogation and has a bearing upon the credibility of the accused as a witness, or of a statement that does not stem from custodial interrogation"), we believe it more nearly reflects the legislative purpose.

**7.** Appellant makes no *Massiah* claim here. Moreover, as we indicated earlier, defense counsel certainly had the ammunition to attack King's testimony. It was up to the jury to determine whether King was telling the truth or simply testifying from a natural preference for the Sheraton as opposed to Tank 3 of the Midland jail. In support of the jury's verdict, however, we note that appellant himself corroborated much of what King said he had told him—with the exception of anything incriminating him in the murder of Sergeant England.

tween one of the jurors, Robert Richards, and one of the victim's sisters, Brenda Leak. During a break in the trial, Richards approached Mrs. Leak, who had earlier testified as a witness for the State. Mrs. Leak described the encounter as follows:

"Q Would you tell us the substance, or not so much the substance, would you tell us the exact words used in the conversation?

"A He extended his hand to shake hands and said, 'My name is Bob Richards, and when this is over would you give me your name and address?'

"Q And how did you respond?

"A I said, 'Okay', or something like that, and then he left.

"Q Was there any other conversation before or since?

"A No.

"Q Have you had any other conversations with any of the other Jurors?

"A No.

"Q Did your sister say anything?

"A Not at all.

"Q Or to your knowledge has your sister had any other conversation with any of the other Jurors?

"A No, we have been very particular not to.

"Q You didn't have any other conversation at lunch, or anything like that?

"A No.

"Q You didn't tell him something about, or words to the effect of 'We will give it to you at lunch, or later'?

"A No, he said, 'At lunch', or 'later', or something like that, and then when I found out he was a Juror, my sister said he was a Juror, and I told Mr. Seltzer that and he said, 'By all means, no contact', so I was away from here at lunch time and there has been no contact.

"Q So he indicated to you he wanted to talk to you at lunch time, or later?

"A Well, he just said, 'Would you give me your name and your address and your telephone number either at lunch time or later, or when it is over'. I believe that was his words.

"Q And you told Mr. Seltzer about this when?

"A Well, immediately. Well, he came down the hall and my sister said he was a Juror.

"Q And that was this morning?

"A Yes."

Wanda Laney, another of the victim's sisters, remembered the conversation somewhat differently:

"Q I was sitting right there. Now, did you have a conversation with one of the Jurors this morning, or did your sister have a conversation that you were a witness to?

"A Yes.

"Q Would you tell us what exactly was involved in that conversation?

"A He introduced himself, told us his name. I forgot what it was, Richardson, I believe, and I believe he asked her if she was from Asheville and she said yes, and I believe he told her he might know someone in Asheville, or something. I don't remember exactly what he said, and then right at the end of it he said, 'I am a Juror and I can't talk to you now', or something like that, 'but after this trial is over I would like to get in touch with you', or something like that.

"Q Did he shake your hand?

"A Not mine. I believe he did hers, but I'm not sure.

"Q And he said he was from the same town you were from?

"A I believe he said he knew someone from Asheville.

"Q Now, it has come to our attention that one of the replies was, 'I will give it to you during lunch time, or immediately after lunch time', do you remember that?

"A No, sir.

"Q What did he want, do you know?

"A He wanted her address, that's all.

"Q Did he ask for your address?

"A No.

"Q And that was outside the Courtroom here, is that correct?

"A Yes.

"Q On the benches outside?

"A Yes.

"Q Y'all didn't have any conversation in the elevator?

"A No.

"Q Any other conversations at all?

"A No, sir.

"Q One last question, did you call it to the attention of the D.A.?

"A Yes.

"Q Which District Attorney?

"A Mr. Seltzer.

"Q And that was immediately?

"A Yes, he came in just shortly after the Juror had come in.

"Q And what was his reply?

"A I don't know, my sister talked to him, I didn't."

Sue Harris, appellant's older sister, gave the following account:

"Q Are you aware of the identity of the persons who have been identified as the sisters of the deceased, J.B. England?

"A Yes, sir.

"Q Have you had occasion to view either or both of the two sisters talking with one or more Jurors?

"A Yes, sir, I have.

"Q Was it both of them?

"A They were both sitting there. The one that got up on the stand yesterday and testified is the one that spoke to the man.

"Q And when did you see the one that testified speak to a Juror?

"A This morning between 8:30 and 9:00.

"Q And where was the conversation?

"A The man walked up and asked—

"Q Where was the conversation?

"A It was out in front of the Courtroom here.

"Q Did you overhear any of the conversation?

"A Yes, sir.

"Q Would you tell us what you saw and overheard?

"A The man walked up to the two ladies. He introduced himself and he said, 'I am a member of the Jury. Is there any way I can get an address from y'all where I can get in touch with you after the trial is over?'

"Q Was there a reply?

"A Yes, sir, they said yes, that they would give it to him, and he said he would talk to them at lunch.

"Q Anything else?

"A No.

"Q Did he shake hands with one or more of them?

"A I don't recall."

Finally, Juror Richards testified at a hearing on appellant's motion for a new trial that he had seen Mrs. Leak "coming back from lunch break" and had introduced himself. He could not remember precisely what was said, but claimed that a newspaper article he had read after the trial contained an exact quote. (The article is not in the record.) Richards then testified as follows:

"Q What I am asking you is to tell me and to tell the Judge what you remember about what you said. I am not asking for the quote in the paper. I am asking you for your memory.

"A Okay, on that point I introduced myself as Robert Richards and said that I was on the Jury. I said I wanted to make her acquaintance and I hoped that I might have the opportunity of obtaining her address, if possible.

"Q And what did she say?

"A She looked up at me and, gosh, she looked up at me and her comments were very short in the fact that she—I guess the way I just said it, 'I hope I would not be imposing upon you if I could ask for your address', and I introduced myself as being a person on the Jury, and she came back and said, 'No, that wouldn't be imposing', and that was the extent of the conversation.

"Q Did you have any more conversation with either her or the other sister that was here at the trial?

"A Never had a conversation with her other sister.

"Q Did you tell them you would get the address or would talk to them about it during or after lunch?

"A No, all I said was that if I could be able to obtain the address at a later time, like at lunch time, or what-have-you, because she was not writing the address or giving me a card at that point, so I just came back and said, 'If it is appropriate I would like to obtain the address at a later time'. My concern was that she was going to leave right then, that she wouldn't stay until the end of the trial and I wouldn't be able to obtain the address.

"Q In any event, it is your testimony that prior to the State resting its case, and before the Defendant had made or had put forth any testimony whatsoever, you had already decided in your own mind that there had been a murder in Midland County?

"A Okay, I would say yes."

According to Richards, he had "debated" talking to Mrs. Leak for about a day, but concluded that he would not be violating the court's instructions [8] "just to make my introduction to her and not to talk to her about the case, but make my introduction to her." Richards explained his motivation thusly:

"Q What was your purpose in contacting the witness Brenda Leak?

"A The purpose was straightforward in that as I had witnessed the witness bearing testimony, or positive identification, I just had a great deal of respect for her, for apparently the family structure from which she came from, and I thought that—well, I guess to be very frank that I, anyone else on the Jury, yourself, Kelly Joe, the family, whoever lived here in Midland would take the opportunity and personally, if they were involved in any way, to give their apology for a situation that occurred in Midland. It had no bearing as far as whether we ever found the person that was involved in that or not. The fact that a situation occurred here in Midland that hopefully should not occur on the earth, I felt very strongly about it

as an individual and as a human being that I should extend an apology to her.

"Q So before the trial was over you already had an opinion about the situation?

"A No, my opinion of the situation was that a man had been murdered, at that point in the trial.

"Q You had already decided that?

"A At that point in the trial we know that a man had been murdered. We know that he had been shot, not by himself, and we knew at that point that he had been shot by somebody. We didn't know who. So at that point in time we knew it had happened in Midland and it was, I think, a very sad situation."

In addition, Richards denied being affected by his conversation:

"Q Mr. Richards, in that relationship in the talk with Mrs. Leak did your conversation with Mrs. Leak in any way affect your thought processes as to Kelly Joe Chambliss' guilt or innocence of the alleged crime?

"A Absolutely not. I will be very frank. At that time if I had any hope it was the hope that Kelly Joe Chambliss had no involvement in it. If I have any desire, it would almost be to the point that we would not know who it was. I was not thinking that we have got to find the person to pay the price, no. My mind was not made up at that time. All I know is that the facts were available that some person had passed away that I felt was of quality, and that his sister was indeed very remorseful."

■ Article 36.22, V.A.C.C.P., provides that "[n]o person shall be permitted to converse with a juror *about the case on trial* except in the presence and by the permission of the court." (Emphasis supplied). Although it is "generally presumed that a defendant is injured whenever an empaneled juror converses with an unauthorized

---

**8.** The court had instructed the jury: "Do not mingle with or talk to the lawyers, the witnesses, the parties, or any person who might be connected with or interested in this case, except for casual greetings." Immediately after this, however, the court warned the jurors not to "discuss anything about this case or mention it to anyone whomsoever. . . ."

**266**

person about a case," the defendant has the burden "to establish that if a conversation did occur between a nonsequestered juror and someone else ... the discussion involved matters *concerning the specific case at trial.*" *Romo v. State,* 631 S.W.2d 504, 506 (Tex.Cr.App.1982) (Citations omitted; emphasis supplied).

█ In the instant case, while Juror Richards had no business talking to Mrs. Leak, the record does not show that he in any way discussed appellant's case, or that Mrs. Leak did. Nevertheless, appellant makes much of Richards' motivation in approaching Mrs. Leak, arguing that his contact with her was "a re-enforcement [sic] of his sympathetic feelings" and, in effect, "a second exposure to evidence without cross-examination." We note first, however, that Richards did not verbally communicate his feelings of sympathy to Mrs. Leak, or suggest anything as to the outcome of the case. Moreover, appellant's argument proves too much, for a juror's feelings may be reinforced simply by eye contact, without any conversation at all. As we read Article 36.22, though, its main purpose is to prevent *an outsider* from saying anything that might influence a juror. *See Pearson v. State,* 145 Tex.Cr.R. 87, 165 S.W.2d 725, 730 (1942) (*Ex parte* statements made by jurors do not constitute a "conversation" so as to invoke Art. 36.22). Here Mrs. Leak said nothing about the trial, and we do not believe that her agreement to provide her address influenced Richards in his verdict. Consequently, we also reject appellant's second ground for review.[9]

Finally, we have examined appellant's remaining grounds of error[10] and conclude that the Court of Appeals properly disposed of them. *Chambliss v. State,* supra. The

judgment of the Court of Appeals is affirmed.

CAMPBELL, J., concurs in result.

should have notified the court rather than determine *sua sponte* that no misconduct occurred. The record does reveal, however, that he advised Mrs. Leak not to have any further contact with Richards. We do not see prosecutorial misconduct calling for a new trial, but express no opinion as to a possible violation of Disciplinary Rule 7–108(G) of the Code of Professional Responsibility.

---

**9.** In view of Juror Richards' confusion about the court's instructions, it might be better practice to warn the jury not to talk to any witness at all, *whether about the case or anything else.* See footnote 8.

**10.** Appellant's third ground of error asserts that the prosecutor should have been disqualified for not bringing Richards' conversation to the attention of the trial court. We think he