

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00050-CR

EDWARD EARL WASHINGTON, III                                     APPELLANT

V.

THE STATE OF TEXAS                                                   STATE

----------

### FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1273131D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Edward Earl Washington, III appeals his conviction for murder. In four points, Washington argues that the evidence is insufficient to prove that as a party to the offense, he possessed the requisite intent to commit murder; that the trial court erred by declining to answer a question submitted by the jury

---

[1]*See* Tex. R. App. P. 47.4.

to the trial court during deliberations; that the trial court erred by not including a sudden-passion instruction in the jury charge at the punishment phase of trial; and that the trial court erred by denying his motion for mistrial after a juror reported having been contacted through social media by someone appearing to be associated with one of the State's witnesses. We will affirm.

## II. BACKGROUND

Washington's fellow gang member Clevin Brown Jr. (C.J.B.) shot and killed Jamari Thomas in the early morning of March 14, 2011, during a brawl between Washington and his cohorts and Thomas and his friends. The fight between the two groups resulted from Thomas having apparently welshed on a bet between him and Washington regarding the 2011 Super Bowl. In the weeks that followed the 2011 Super Bowl, Washington increasingly harassed and threatened Thomas because of his refusal to pay. Eventually, the two agreed to meet and "fight it out." During this meeting, the above-mentioned brawl ensued. After C.J.B. shot and killed Thomas, the State charged Washington, as a party to the offense, with murder and with engaging in organized criminal activity, to-wit: murder.

At trial, Jasmine Boston testified that Thomas was her boyfriend. Boston said that she dated Thomas for a few years and that he was passionate about his musical career. By Boston's account, Thomas utilized a positive message in his music and steered away from cussing and misogyny. Boston said that Thomas made a $40 bet with Washington over the 2011 Super Bowl and that Thomas lost

the bet. According to Boston, Thomas refused to pay Washington because the bet was a "Facebook bet" and Thomas did not take the bet seriously.

Boston testified that a few weeks after the Super Bowl, Washington began "harassing" Thomas over his refusal to pay and that Washington's harassment "started becoming an actual problem." Boston said that Thomas told her that Washington's harassment involved "disturbing" text messages, including Washington expressing his desire to fight Thomas for the $40.

Boston recalled that on March 13, 2011, Thomas performed at a rap concert at a venue called Dreamworld. As Boston arrived, she encountered Washington in the parking lot, and he made a derogatory comment regarding Thomas. While in the club, Washington and C.J.B. approached Boston, and one of them asked her for her number. They also expressed their knowledge that she dated Thomas. Boston said that because of Washington's and C.J.B.'s presence, Thomas and his friends left the performance premises through the back door because of fears that Washington wanted to get into a physical altercation with Thomas.

Later that night, Boston, Thomas, and some of their friends were at Thomas's house. Boston said that at one point, Thomas received "at least 15" calls from Washington's phone but that Thomas ignored most of them. Boston also said that Washington sent Thomas numerous text messages.

Boston averred that after these calls, she, Thomas, and two other friends got into Thomas's car in order to drive to a nearby 7-Eleven. Boston said she

3

drove the car. While en route, Boston said that Washington's name "[came] up." Boston said that as they arrived at the 7-Eleven, a vehicle was parked in an unlit area of the parking lot that was shared between the 7-Eleven and a neighboring school. She said that as they pulled into 7-Eleven, they purposely backed into a parking spot in front of the store, "just being cautious of [their] surroundings."

Boston testified that as they backed in, the car that had previously been parked in the dark portion of the parking lot pulled in front of Thomas's car, blocking Thomas's car from being able to leave. From there, one of the occupants of that car came to the passenger side of Thomas's vehicle, where Thomas was sitting, grabbed Thomas's head, and pulled him from the vehicle, announcing to him that he was going to fight. Boston recognized the person as C.J.B.

Boston averred that as C.J.B. fought with Thomas, she, the two other male occupants from Thomas's car, and other occupants from the car that had blocked them in began to fight. Boston said that Washington was one of the assailants from the car. Boston stated that Washington joined C.J.B. in his fight with Thomas. According to Boston, during the scuffle, Washington retrieved a "wooden plank" from the vehicle he had arrived in. Boston said that Washington, armed with the wooden plank, attempted to strike Thomas from behind in the head. But Boston said that she intervened by shoving Washington. A photograph of the wooden plank was admitted into evidence and displayed to the jury. Boston further testified that at that point, C.J.B. "pull[ed] out his gun and

4

sho[t]" Thomas from about "12 feet" away. Boston said that suddenly she began screaming, a girl got out of the blocking vehicle and pulled C.J.B. into it, Washington "jumped into" it, and the vehicle sped away.

From there, Thomas's other two friends put him in the backseat of his car, and they drove to a nearby hospital. Boston testified that by that time, Thomas appeared dead and that blood was coming from his mouth. When they arrived at the hospital, hospital personnel took Thomas, and Boston talked to the police about what had transpired. Boston also said that the next morning, police interviewed her at the police station, where she gave her statement and that she identified Washington from a photo array a few days later. Through the use of trial exhibits, Boston diagramed for the jury the events that occurred at the 7-Eleven that early morning.

Shawaiz Chowhan testified that around 3:00 a.m. on March 14, 2011, he stopped for gas at the 7-Eleven where Thomas was shot. Chowhan said that as he waited for his friend to pay for the gas, he noticed that a vehicle had backed into a parking spot in front of the 7-Eleven. Chowhan described how the vehicle Washington was in pulled up and blocked Thomas's car, and he said that multiple people got out of the car and began "punching" the occupants of Thomas's car. He averred that Washington had a "wooden pallet" or "two-by-four," and was "running at somebody [from Thomas's car]" with it. Chowhan said that an occupant of his car stated that they should leave because someone in the scuffle had a gun. Chowhan recalled hearing "gunshots" and then "we were

5

gone." Chowhan described the people from the vehicle Washington was in as the "aggressors" in the fight. He also said that preceding the fight, one of the occupants of his own vehicle said that someone in Thomas's car was arguing with someone on the phone.

The State introduced photographs displaying Chowhan's vehicle in relation to where the two vehicles involved in the altercation were. Utilizing the photograph, Chowhan demonstrated how Washington's vehicle blocked Thomas's vehicle immediately prior to the altercation and shooting. Chowhan said that the "shooter" definitely came from the vehicle Washington occupied. Chowhan averred that after this occurred, he left abruptly and went to the local police station to inform police what had transpired. While en route, an occupant of his car called the police. Chowhan eventually returned to the 7-Eleven with the police. He stated to the jury that when he returned, he saw a pool of blood and the wooden plank he had seen one of the aggressors wielding earlier. Chowhan confirmed that the wooden plank the State had introduced appeared to be the one he saw that morning.

Arlington Police Department Corporal Ray Mullikin testified that he was a member of the Department's "gang unit." According to Mullikin, Washington and C.J.B. belonged to a gang named "Lynch Mob." Mullikin testified that if someone were to "[welsh]" on a bet with a member of Lynch Mob, his experience would lead him to expect that the gang member would act out violently against the

6

person who failed to pay. He also testified that it is not unusual for gangs like Lynch Mob to enforce "respect" by retaliating for failure to pay debts.

Jordan McHenry testified that he had recently worked in the entertainment industry and had gone to high school with both Washington and C.J.B. He also knew Thomas. McHenry said that Thomas was a locally "well-known" rapper. He said that he also had made bets on the 2011 Super Bowl with Thomas and Washington through Facebook. McHenry said that he paid Washington but that Thomas failed to pay either McHenry or Washington for losing the bets he made with them. After Thomas failed to pay both McHenry and Washington, according to McHenry, Washington began to text McHenry that he was angered that Thomas had not paid. McHenry said that he believed that "something" would happen but did not think it would be as serious as Thomas being shot.

McHenry testified that he hosted the event at Dreamworld the night Thomas performed and Washington and C.J.B. approached Boston. By McHenry's account, Thomas left "out the back" after performing because of Washington's and C.J.B.'s presence.

Krys Trigg testified that he was Thomas's best friend and that Thomas had made him aware of the Super Bowl bet he had with Washington. Trigg said that he knew of Washington's affiliation with Lynch Mob and that Lynch Mob members were known to carry weapons and "roll . . . real deep." He averred that Lynch Mob members were notorious for fighting and using overwhelming numbers to defeat whoever they fought. Trigg said that after Thomas failed to

7

pay Washington, Washington began to increasingly text Thomas with "details about [how Washington] was going to kill [Thomas]." By Trigg's account, he was at the Dreamworld performance and saw Washington and C.J.B. there as well. Trigg said that although he did not see the interaction, Thomas told him that as he performed on stage, Washington and C.J.B. displayed "gang signs [and] the gun sign" and otherwise indicated that they wanted to fight Thomas. Trigg said that Thomas was so unnerved by C.J.B.'s and Washington's actions that Thomas wanted to leave shortly after performing.

Trigg averred that after Thomas left through the back door, he proceeded out the front, encountering C.J.B. and Washington, and that he asked them what their issue with Thomas was. According to Trigg, C.J.B. and Washington said that they intended to fight Thomas regardless of Thomas's desire not to fight. Trigg said that at that time, C.J.B. prevented Washington from proceeding to the parking lot to confront Thomas. Trigg also said that after the show, he, Thomas, Boston, and a few other friends went back to Thomas's house and that Washington began to call and text Thomas incessantly. Thomas eventually answered Washington's call and agreed to fight Washington at the 7-Eleven, but he expressed to Trigg that he really did not want to fight.

Trigg testified that as they approached the 7-Eleven, he saw a vehicle parked in the darker area of the parking lot adjoining the 7-Eleven. Trigg said that after they arrived, they did not initially back into the parking spot and that, not knowing that the vehicle in the dark was occupied by Washington and his

8

comrades, Thomas called Washington to inquire where he was. Trigg averred that Washington insisted that they come to the darker part of the parking lot, but Thomas insisted that they meet in the lit area. Because things did not "feel right," Trigg suggested that they re-park the vehicle by backing into the parking spot so that they could leave in a hurry if necessary. At that time, the vehicle Washington was in pulled up and blocked Thomas's vehicle so that they could not leave. Suddenly, C.J.B. jumped out of the blocking vehicle, came to the passenger side of Thomas's car, declared to Thomas that he was "fixing to fight," shouted at Thomas that he needed to get out, and then proceeded to wrestle him out of the car. From there, Trigg said a melee broke out among multiple people from both vehicles. During the melee, Trigg pulled C.J.B. off of Thomas, and then C.J.B. pulled out a gun. Trigg said that both he and Thomas attempted to wrestle the gun away from C.J.B. Trigg stated that during the struggle, he was knocked down by someone hitting him in the head. He testified that he then saw Thomas and C.J.B. struggling with the gun and that then he heard the gun go off. Trigg said that from his perspective, C.J.B. intentionally shot Thomas. By Trigg's account, as C.J.B. got up, Thomas also attempted to get up but could not; Trigg could see blood coming out of Thomas's mouth. According to Trigg, after C.J.B. shot Thomas, Washington attempted to hit Thomas as Boston interfered and C.J.B. went "back over [toward Thomas] with his gun." Trigg averred that C.J.B. appeared to be attempting to shoot Thomas a second time. A girl from the vehicle Washington and C.J.B. had arrived in, however, grabbed C.J.B. before

9

he could shoot again and shoved him in their car, the rest of the occupants joined them, and the car sped away.

Arlington Police Department Detective Lisa Terro testified that the department assigned her to investigate Thomas's homicide. Terro said that Trigg and Boston had identified C.J.B. and Washington as two of the individuals who were involved in the melee on the morning Thomas was shot and that Boston had identified C.J.B. as the person who shot Thomas. Terro also said that both C.J.B. and Washington were known Lynch Mob gang members. During her testimony, the State introduced records containing the contents of Washington's cell phone, including texts between Washington and multiple people during the time between the Super Bowl at the end of January and when Thomas was shot.

Terro testified that the text messages demonstrated that Thomas had made a bet with Washington regarding the 2011 Super Bowl, that Thomas had refused to pay his debt to Washington, that Washington had threatened Thomas due to his failure to pay, that Washington had inquired of others about Thomas's whereabouts, and that Washington had informed others that he was going to kill Thomas in order to protect his reputation. One text in particular read that Washington would not be concerned if Thomas wore a bullet-proof vest because Washington bragged that he took "head shots."

Another text from Washington indicated that he was not willing to only "hospitalize" Thomas because Thomas would be able to "put [Washington] in jail" but that "[a] dead man tells no tales." On the night Thomas performed at

10

Dreamworld, Washington texted his own girlfriend stating that he would need her to call his mom if he went to jail because he was going to shoot someone that night. Washington even texted his girlfriend where she could find bail money.

The texts reveal that after Thomas was shot, Washington texted his girlfriend with a text reading, "I shot him." Then later Washington texted someone and asked them not to mention that Thomas was murdered because of a Facebook bet, and later Washington texted someone and asked him to provide him an alibi for the time Thomas was shot. Shortly thereafter, Washington texted someone that he was going to go to jail for murder. When the individual texted back asking who Washington had killed, Washington said that he had left Thomas "dead on [the] curb" because Thomas owed him money.

Washington also later texted his girlfriend, asking that he and C.J.B. be allowed to "cool off" at her place while the police looked for them. Later, Washington texted his girlfriend and said that one of the guys that was with them at the 7-Eleven shooting had "snitched" on him.

During jury deliberations on guilt-innocence, the jury sent several notes to the trial court requesting additional information, instruction, and review of portions of the evidence. One such note requested a clarification on the court's charge. Specifically, the jury note inquired whether the charge's deadly-weapon language, "to-wit, firearm" meant that the only deadly weapon in the charge was a firearm, or that a firearm was an "example" of a deadly weapon. The trial court declined to answer the question and instead referred the jury back to the court's

11

charge. Washington objected that the trial court needed to clarify the law for the jury, and the trial court overruled the objection.

The jury returned a verdict of not guilty regarding the engaging in criminal activity charge and a verdict of guilty on the murder charge under a party-to-the-offense theory. During the charge conference on punishment, Washington's attorney requested a sudden-passion instruction, arguing that there was at least some evidence that C.J.B. had shot Thomas because he was provoked by the other occupants of Thomas's car having joined in the melee. The trial court denied the request.

During the punishment phase, Juror Number Two notified the court that she had been contacted by someone she did not know via the social network "Instagram." The juror stated that she had been sent a friend request from someone going by the moniker "1Yungmon," a person she did not know. While reviewing the friend request from 1Yungmon, the juror recognized that two photographs on the account contained Boston, Thomas's girlfriend and the State's first witness during the guilt-innocence phase of trial. Juror Number Two explained to the court that she did not know who 1Yungmon was, that she did not know if it was someone associated with the case attempting to contact her, and that she had not had any communication with this person. She stated that she had not seen any pictures or otherwise received information from this friend request that was in any way related to the case. And Juror Number Two stated that she did not believe that 1Yungmon was Boston nor did she believe that

12

Boston was attempting to contact her. The juror averred that the contact from 1Yungmon would not have any effect on her deliberations and that she would be able to maintain her fairness and impartiality.

Washington moved for a mistrial and an acquittal based on Juror Number Two's revelation concerning the Instagram friend request, and the trial court denied Washington's motion. The trial court did, however, offer the less extreme measure of unseating Juror Number Two and replacing her with the alternate juror. Both the State and Washington declined this remedy, and the trial court ruled that Juror Number Two would remain a juror in the case. Eventually, the jury returned a sentence of 35 years' incarceration and a $10,000 fine. The trial court entered judgment accordingly, and this appeal followed.

### III. DISCUSSION

#### A. Sufficiency of the Evidence of an Intent to Kill

In his first point, Washington argues that "there does not exist a modicum of evidence to reflect an intentional or knowledgeable killing or desire to cause serious bodily injury by [C.J.B.] in shooting [Thomas] because the evidence only reflected an accidental shooting while [C.J.B.] and [Thomas] were wrestling over the gun." We disagree.

A person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Nelson v.*

13

*State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *see also* Tex. Penal Code Ann. § 19.02(b)(1) & (2) (West 2011).

The intent to kill may be inferred from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon. *See Ervin v. State*, 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), *cert. denied*, 131 S. Ct. 2992 (2011). Intent may also be inferred from the means used and the wounds inflicted. *See Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974). Indeed, "when a deadly weapon is fired at close range, and death results, the law presumes an intent to kill." *See Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)*.*

To determine whether an individual is a party to an offense, the reviewing court may look to events before, during, and after the commission of the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). There must be sufficient evidence of an understanding and common design to commit the offense. *Id.* Evidence may be direct or circumstantial. *See id.* Each fact need not point directly to the guilt of the defendant as long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties. *Id.* But the mere presence of a person at the scene of a crime, or even flight therefrom, without more, is insufficient to support a conviction as a party to the offense. *Id.*

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to

14

determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Winfrey*, 393 S.W.3d at 768. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Temple*, 390 S.W.3d at 360.

Washington does not dispute that C.J.B. shot and killed Thomas, but he contends that the evidence is insufficient to support his conviction because, according to Washington, the evidence establishes that C.J.B. shot Thomas

15

accidently and therefore did not possess the requisite intent to commit murder. In support of this argument, Washington cites to Trigg's testimony that the gun "went off" while C.J.B. and Thomas "wrestl[ed] on the ground over the gun." Thus, according to Washington, there is no evidence that he or C.J.B. intended for C.J.B. to shoot Thomas.

But Trigg specifically testified that not only did he believe that C.J.B. intentionally shot Thomas when the gun "went off" but that C.J.B. attempted to shoot Thomas a second time and was thwarted by a female occupant of the vehicle C.J.B. and Washington arrived in. Further, Trigg testified that even after C.J.B. shot Thomas, Washington tried to strike Thomas but that his attempts to further injure Thomas were thwarted by Boston. Thus, contrary to Washington's argument, Trigg's testimony supplied the jury with evidence of Washington's attempt to aid C.J.B. in committing the offense with the intent to promote or assist the commission of the murder. *See Gross*, 380 S.W.3d at 186.

Moreover, events before, during, and after Thomas was shot support the inference of Washington's participation in a common design to murder Thomas. *See Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994), *cert. denied*, 519 U.S. 1030 (1996) ("In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."). Here, the State introduced evidence that Washington had threatened to kill Thomas prior to the

shooting because of Thomas's failure to pay his debt on the Super Bowl bet. The State also elicited testimony that C.J.B. and Washington had displayed a "gun sign" directed at Thomas on the night Thomas performed at Dreamworld. The record evidence also demonstrates that Washington believed that he had to kill Thomas in order to protect his reputation, that he had informed his girlfriend of his intent to kill Thomas the night before Thomas was shot, that he had informed his girlfriend of where she could acquire bail money in case he was arrested for murdering Thomas, and that he bragged about killing Thomas after the melee. Furthermore, record evidence demonstrates that Washington attempted to hide from the police with C.J.B. at the house of Washington's girlfriend and that he asked someone to provide a false alibi for him. *See id.*, 920 S.W.2d at 302 (reasoning that acts designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial demonstrate a consciousness of guilt).

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have reasonably found that C.J.B. intended to shoot Thomas and that Washington committed the offense of murder as a party to the offense. *See Smith v. State*, 187 S.W.3d 186, 192 (Tex. App.—Fort Worth 2006, pet ref'd) (holding evidence sufficient to support conviction for capital murder under law of parties where defendant and cohorts robbed store clerk and one of defendant's cohorts took victim to back room and shot him in his chest and head). We overrule Washington's first point.

17

## B.    The Trial Court Referring the Jury to the Court's Charge

In his second point, Washington argues that the trial court reversibly erred by refusing to answer one of the jury's questions and instead referring the jury to the court's original charge.

Here, during deliberations on guilt or innocence, the jury sent this note to the trial court:

> In the law, there is a section that states '. . . to-wit, a firearm . . .' does 'to-wit' specify firearm; meaning the charge is only . . . for the firearm.  Or does 'to-wit' mean an example of [sic] is a firearm.

Rather than answering the question, the court instructed the jury to continue its deliberations and to refer to the court's charge.  Citing cases that stand for the proposition that a trial court may not generally answer a jury's note by making an improper comment on the weight of the evidence, Washington argues that the trial court's refusal to answer the question left the jury with a misperception of the law and that the jury could have reached a guilty verdict based on Washington or C.J.B. having used a different weapon other than a firearm.  *See Lucio v. State,* 353 S.W.3d 873, 877 (Tex. Crim. App. 2011) ("[T]he trial court did not improperly comment on the weight of the evidence in its answer, which provided a correct statement of the law without expressing any opinion as to the weight of the evidence or assuming the existence of a disputed fact.").  We disagree.

The jury is bound to be governed by the law it receives from the court. Tex. Code Crim. Proc. Ann. art. 36.13 (West 2007); *Lucio,* 353 S.W.3d at 875;

18

*Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986). Although the trial court ordinarily provides instructions to the jury in their entirety before the jury retires to deliberate, the court may give further written instructions upon the jury's written request for additional guidance regarding applicable law. *See* Tex. Code Crim. Proc. Ann. art. 36.16 (West 2006) (providing that court may give "further charge" to jury upon jury's request after parties finish closing arguments). When the trial court responds substantively to a question the jury asks during deliberations, that communication essentially amounts to a supplemental jury instruction, and the trial court must follow the same rules for impartiality and neutrality that generally govern jury instructions. *See Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993).

A trial court's decision to provide a written response, however, is within its discretion. *See Allaben v. State*, 418 S.W.2d 517, 520–21 (Tex. Crim. App. 1967) (recognizing that a trial court has discretion to refuse to answer the jury by referring jurors to the court's charge when it deems the jury's questions to be improper). In addition, it is well-settled that when communications between the court and jury do not amount to an additional instruction, noncompliance with provisions of the procedural statute governing jury communications with the court is not reversible error. *See generally* Tex. Code Crim. Proc. Ann. art. 36.27 (West 2006) (prescribing process by which jury may communicate with trial court); *see also McFarland v. State*, 928 S.W.2d 482, 517–18 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997), *overruled on other grounds by Mosley*

19

*v. State*, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999).

Here, it is evident from the record that the court's response did not constitute additional instructions. As the court of criminal appeals has stated, "[A] refusal to answer the jury question does not constitute additional instructions . . . , nor is a referral to the original charge considered an additional instruction." *See Allaben*, 418 S.W.2d at 520; *see also Nacol v. State*, 590 S.W.2d 481, 486 (Tex. Crim. App. 1979) (holding that trial court did not err by instructing jury, "You are only to consider what is contained in the charge"); *see also Gillett v. State*, 663 S.W.2d 480, 481 (Tex. App.—Corpus Christi 1983, no pet.) (affirming trial court's instruction that jury was to follow the charge only); *Phillips v. State*, 654 S.W.2d 846, 848 (Tex. App.—Dallas 1983, no pet.) (holding trial court did not err by instructing jury that it was its duty to follow the charge). Thus, the trial court was within its discretion to refer the jury to the court's charge and it did not commit reversible error by declining to further instruct the jury in response to the jury's note. *See McFarland*, 928 S.W.2d at 517–18. We overrule Washington's second point.

## C. Sudden Passion

In his third point, Washington contends that "[b]ecause th[e] evidence raised the possibility of sudden passion, the trial court reversibly erred in refusing the requested instruction." Washington's argument is that, even though C.J.B. dragged Thomas from his car and began to fight him, C.J.B. did not draw his gun

20

until after the other occupants of Thomas's car began to fight with C.J.B.; thus, Washington argues, C.J.B. "did not act to obtain the weapon until he was in fear for his life." Washington argues that this evidence entitled him to a sudden-passion instruction. We disagree.

During the punishment phase of trial, a defendant may argue that he caused the death while under the immediate influence of sudden passion arising from an adequate cause. *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005); *see also* Tex. Penal Code Ann. § 19.02(d) (West 2003). "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). Sudden passion is a mitigating factor that, if found by the factfinder to have been proven by a preponderance of the evidence, reduces the offense from a first-degree felony to a second-degree felony. *See id.* § 19.02(c), (d).

A trial court should include a sudden-passion instruction in the charge if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable. *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003). But the evidence cannot be so weak, contested, or incredible that it

21

could not support such a finding by a rational jury. *McKinney*, 179 S.W.3d at 569. Therefore, to be entitled to a jury instruction on sudden passion, the evidence must exist in the record that there was an adequate provocation; that a passion or an emotion such as fear, terror, anger, rage, or resentment existed; that the murder occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the murder. *Id.*

Furthermore, one who provokes or instigates a confrontation cannot claim sudden passion to excuse his actions. *See Westbrook v. State*, 846 S.W.2d 155, 159 (Tex. App.—Fort Worth 1993, no pet.). Stated another way, the provocation must not have been itself provoked by the person seeking to avail himself of the sudden-passion instruction to the jury. *Willis v. State*, 936 S.W.2d 302, 308–09 (Tex. App.—Tyler 1996, pet. ref'd). When an appellant creates the circumstances that inflame his passion, a charge on sudden passion is not required. *Id.* at 309.

We review a trial court's decision whether to instruct the jury on a defensive issue, such as sudden passion, for an abuse of discretion. *See Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (*citing Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001)). In reviewing a case involving a sudden-passion jury charge, it is our duty to focus on the evidence supporting that charge, not on the evidence refuting it. *Trevino*, 100 S.W.3d at 239.

22

Here, the only evidence that Washington points to is the fact that C.J.B. did not pull the gun out of his pants until after the other occupants of Thomas's car began to fight with C.J.B. Specifically, Washington argues that the evidence is "undisputed" that C.J.B. pulled the gun out of his pants "out of fear, terror, anger or resentment" once Trigg and Boston joined the ruckus. Washington, however, points to no evidence in the record that C.J.B. acted out of "fear, terror, anger or resentment." Furthermore, C.J.B.'s prior provocation is shown by the fact that he deliberately set out to fight Thomas by opening the car door and pulling Thomas out of the car, insisting that they were going to fight. Moreover, the evidence of when C.J.B. pulled the gun out of his pants does not indicate that Thomas or anyone in Thomas's vehicle did anything new that would give rise to sudden passion after both parties arrived at the 7-Eleven and C.J.B. began to fight Thomas. *See Westbrook*, 846 S.W.2d at 159 ("[T]he evidence Westbrook relies on does not indicate that upon arrival at the motel Willingham or Autrey did anything new that would give rise to sudden passion."). Thus, we hold that there is no evidence of sudden passion and that therefore the trial court properly refused to include a sudden-passion instruction in the jury charge. We overrule Washington's third point.

## D.    Denial of Mistrial Regarding Juror Number Two

In his fourth point, Washington argues that the trial court erred by denying his motion for mistrial. Washington argues that a mistrial and an acquittal was warranted in this case because Juror Number Two received a friend request via

23

Instagram from a person who Washington claims was Boston, the State's first witness—the juror also saw two pictures of Boston while reviewing the request. Washington argues that this amounted to improper outside influence on the jury.

The State argues that when viewing the evidence in the light most favorable to the trial court's ruling, the trial court did not abuse its discretion because the evidence did not establish that it was Boston who sent the request and because Juror Number Two testified that she had not received any information about the case from the request and that the contact would not have any impact on her ability to be fair and impartial in her deliberations. The State further argues that there were less drastic alternatives than a mistrial that Washington could have asked for, and in fact, Washington turned down the trial court's offer to remove the juror and seat the alternate juror. We agree that the trial court did not abuse its discretion.

A mistrial is an extreme remedy for prejudicial events occurring during the trial process. *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996). It is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 120 S. Ct. 1680 (2000). Only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant is a trial court required to grant a mistrial. *Bauder*, 921 S.W.2d at 698. The denial of a

24

motion for mistrial is reviewed under an abuse-of-discretion standard. *Grotti v. State*, 209 S.W.3d 747, 776 (Tex. App.—Fort Worth 2006) *affirmed by Grotti v. State*, 273 S.W.3d 273, 283–84 (Tex. Crim. App. 2008).

A juror must make decisions at the guilt–innocence and punishment phases using information obtained in the courtroom: the law, the evidence, and the trial court's mandates. *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 927 (2003). "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22 (West 2006); *see also* Tex. R. App. P. 21.3(f) (providing that defendant must be granted new trial when juror has talked with anyone about case). The primary goal of article 36.22 is to insulate jurors from outside influence. *Chambliss v. State*, 647 S.W.2d 257, 266 (Tex. Crim. App. 1983); *cf. Gomez v. State*, 991 S.W.2d 870, 872 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd), *cert. denied*, 528 U.S. 1157 (2000) (holding that no violation of article 36.22 existed where two jurors discussed case with each other in public place). "Therefore, if a violation is shown, the effectiveness of possible remedies will be determined in part by whether the conversation influenced the juror." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

When a juror converses with an unauthorized person about the case, "injury to the accused is presumed" and a mistrial may be warranted. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991), *cert denied*, 512 U.S.

1246 (1994). To invoke this presumption, the defendant must show the communication involved matters concerning the defendant's trial. *Chambliss*, 647 S.W.2d at 266. We presume harm even when the communication does not rise to the level of a full-blown conversation or discussion of the specifics of a given case. *McIntire v. State*, 698 S.W.2d 652, 659 (Tex. Crim. App. 1985). But the State may rebut this presumption of harm by showing that the defendant has not been injured, i.e., "that the case was not discussed or that nothing prejudicial to the accused was said." *Green v. State*, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 1020 (1993). *Compare Gates v. State*, 24 S.W.3d 439, 443 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding that State rebutted presumption when victim's son communicated with juror prior to his testimony at trial because only new information son conveyed to juror was that son was witness in case), *with Ites v. State*, 923 S.W.2d 675, 676 (Tex. App.— Houston [1st Dist.] 1996, pet. ref'd) (reversing trial court's judgment because State failed to rebut presumption of harm when defendant's son ran in front of jurors, saying that if he had to spend an hour with his father, he would kill himself, where defendant was being tried for aggravated sexual assault of his daughter and son had been sworn in as witness). "If evidence is in the record that rebuts the presumption of harm, it should be considered, whether presented by the State or the defense." *Alexander v. State*, 919 S.W.2d 756, 767 (Tex. App.— Texarkana 1996, no pet.). When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most

26

favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor. *Quinn v. State*, 958 S.W.2d 395, 401–02 (Tex. Crim. App. 1997).

Here, there is no evidence that Juror Number Two communicated with anyone about Washington's case outside the confines of the trial itself. Juror Number Two testified that she did not know who had sent her the Instagram friend request, that she had not communicated with the person behind the request, and that she had not seen or reviewed any content from the request "that could be related to this particular case." Thus, Washington has failed to invoke the presumption that he was injured by the Instagram friend request sent to Juror Number Two. *See Chambliss*, 647 S.W.2d at 266. But even assuming that the presumption that Juror Number Two communicated with an unauthorized person was invoked, the juror's testimony to the trial court was that she had not discussed the case with the person behind the request and that nothing prejudicial about the accused was said or communicated. *See Green*, 840 S.W.2d at 406. Furthermore, although the trial court did not grant a mistrial and enter a judgment of acquittal as Washington requested, the trial court did offer the curative measure of removing Juror Number Two from the panel and allowing the alternate juror to be seated, but both the State and Washington declined this curative measure. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) ("[W]hen a party's first action is to move for mistrial . . . the scope of appellate review is limited to the question whether the trial court erred in not

27

taking the most serious action of ending the trial."). And it was within the trial court's discretion to believe Juror Number Two's testimony that she had not discussed the case with anyone related to it and that she could maintain her fairness and impartiality. *See Quinn*, 958 S.W.2d at 401–02. We hold that the trial court did not abuse its discretion by denying Washington's motion for mistrial. We overrule Washington's fourth point.

## IV. CONCLUSION

Having overruled all four of Washington's points on appeal, we affirm the trial court's judgment.

PER CURIAM

PANEL: MEIER, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 12, 2015

28